351 F.2d 756
 AKTIEBOLAGET SVENSKA AMERIKA LINIEN (SWEDISH-AMERICAN LINE) et al., Petitioners,
v.
FEDERAL MARITIME COMMISSION and United States of America, Respondents,
American Society of Travel Agents, Inc. (ASTA), Intervenor.
 No. 18554.
 United States Court of Appeals District of Columbia Circuit.
 Argued December 11, 1964.
 Decided June 10, 1965.
 
 Mr. Edward R. Neaher, of the bar of the Court of Appeals of New York, New York City, pro hac vice, by special leave of court, with whom Messrs. Warren E. Baker, Washington, D. C., and Lino A. Graglia, New York City, were on the brief, for petitioners.
 Mr. Gordon M. Shaw, Atty., Federal Maritime Commission, of the bar of the Supreme Court of Illinois, pro hac vice, by special leave of court, with whom Asst. Atty. Gen. William H. Orrick, Jr., Messrs. James L. Pimper, Gen. Counsel, Robert E. Mitchell, Deputy Gen. Counsel, Federal Maritime Commission, Irwin A. Seibel and Arthur J. Murphy, Jr., Attys., Dept. of Justice, were on the brief, for respondents.
 Mr. Robert J. Sisk, of the bar of the Court of Appeals of New York, New York City, pro hac vice, by special leave of court, with whom Mr. Rocco C. Siciliano, Washington, D. C., was on the brief, for intervenor. Messrs. Charles A. Hobbs and Paul S. Quinn, Washington, D. C., also entered appearances for intervenor.
 Before EDGERTON, Senior Circuit Judge, and WASHINGTON and DANAHER, Circuit Judges.
 WASHINGTON, Circuit Judge:
 
 
 1
 This is a petition by steamship lines, which are members of the Trans-Atlantic Passenger Steamship Conference (TA PC) and the Atlantic Passenger Steamship Conference (APC), to review a final order of the Federal Maritime Commission in a proceeding begun on petition of the American Society of Travel Agents, Inc. (ASTA). Insofar as relevant here, that order disapproved under Section 15 of the Shipping Act of 1916, as amended, 46 U.S.C. § 814 (Supp. V, 1959-63), two provisions of the steamship conference agreements, namely: (1) the provision which requires unanimous action of Conference members (the petitioning steamship companies) to fix or alter the maximum commission payable to travel agents appointed by the Conferences to sell passenger bookings on Conference ships (hereinafter referred to as the "unanimity rule"); and (2) the provision which prohibits travel agents so appointed from selling passenger bookings on competing non-conference steamship lines without prior permission from the Conferences (hereinafter referred to as the "tieing rule").
 
 
 2
 Three United States steamship lines and twenty-three foreign-flag steamship lines comprise the membership of the steamship conferences before us.[1] We note that our country has adopted a policy, in the international transportation field, of encouraging, or at least allowing, United States carriers to participate in the steamship conferences, and to be governed by unanimity in respect of matters covered by conference agreements, barring disapproval under the standards prescribed by 46 U.S.C. § 814. Congress has recognized that, without such agreements, competition could become so destructive as to wreck the carriers. See S.Rep.No. 860, 87th Cong., 1st Sess. 4, 8-9, and passim (1961), issued with respect to an investigation of the shipping industry,[2] and the "Alexander Report," H.Doc.No. 805, 63d Cong., 2d Sess. 46-47, 295 (1914), the study leading to the Shipping Act of 1916. And cf. Boyd [the then Chairman of the Civil Aeronautics Board], The Future of the International Carrier, FLIGHT FORUM 7 (Sept. 1964).[3] To this end, Congress has provided in 46 U.S.C. § 814 that such steamship conference agreements are exempt from the provisions of the United States antitrust laws when approved by the Federal Maritime Commission, that the Commission may disapprove an agreement only if it finds the agreement to be
 
 
 3
 "unjustly discriminatory or unfair as between carriers * * *, or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest, or to be in violation of this chapter,"
 
 
 4
 and that it shall approve all other agreements.[4]
 
 
 5
 1. The Unanimity Rule.
 
 
 6
 In his Initial Decision the Hearing Examiner, appointed by the Commission, concluded that the unanimity rule should be approved. Upon review the Commission (by vote of three members, with two members dissenting) disagreed, finding that the unanimity rule as applied to agents' commissions operates to the detriment of the commerce of the United States and hence must be disapproved under Section 15 of the Shipping Act.[5] The Commission based its factual conclusion on the following considerations:
 
 
 7
 "It [the unanimity rule] is a regulation which prevents travel agents in the United States from rendering complete and effective service both to passengers and to ocean carriers. It has in some cases prevented the principals from even considering the question of commission levels and in others has defeated, or at least delayed or watered down the desires of the majority of the lines to raise commission levels, thus placing the steamship lines at a competitive disadvantage vis-a-vis the airlines."
 
 
 8
 As to the first point, we cannot agree that the unanimity rule prevents complete and effective service by travel agents. The commission rate of 7% which was being paid at the time of the hearing below was arrived at by unanimous agreement and was the same as that paid by the transatlantic airlines. It was found, however, that appointed agents tend to push air rather than sea travel, because, as the Commission stated, it "takes approximately three or four times as much of an agent's time to sell sea as compared with air space, and several years of experience are required to produce a really competent steamship passage salesman."[6] On the basis of the Commission's own statement, therefore, it is not the unanimity rule, but economic factors which prevent agents "from rendering complete and effective service both to passengers and to ocean carriers" — if by that the Commission meant the "pushing" of air over sea travel.[7] And the Commission's opinion suggests no other way in which complete and effective service by appointed agents is prevented.[8]
 
 
 9
 In this connection it is to be noted that the Hearing Examiner pointed out that, because of the economic advantage to the agent in selling air transportation over steamship transportation, the practice by appointed agents of diverting a prospective passenger from sea to air transportation "is prevalent enough to constitute a substantial competitive disadvantage for the shiplines and an interference with a free and objective choice between the two modes of transportation by potential travelers, such interference being based on the self-serving interest of the travel agents." He found that this practice is not in "the best interest of the traveler"; "is not in the best interest of commerce and is adverse to the public interest." But he noted that the conferences might amend their rules to prohibit such diversion, with appropriate penalties for violations (though we do not pass on this conclusion as a matter of law); and that it was not the unanimity rule on commissions which had caused the evil. We find this reasoning persuasive.
 
 
 10
 As to the second reason or ground given by the Commission for disapproval of the unanimity rule as applied to agents' commissions — that the desires of the majority of the steamship lines are frustrated, thus placing steamship lines at a competitive disadvantage — we find nothing in the Commission's findings to indicate that frustration of the desires of the majority is the factor which places steamship lines at a competitive disadvantage. As the Examiner stated, the record does not show that a majority would decide now to raise the commission level above 7% or would have raised it to that figure at any time before the conference voted unanimously to do so in 1956. Indeed, the Commission itself said that for economic reasons, it perhaps is not feasible for the steamship lines to raise commission levels at the present time. Most significantly there is no finding that a higher rate would improve the competitive position of the steamship lines.
 
 
 11
 As Commissioners Patterson and Day point out, even though effectuation of the wishes of the majority as to the commission level has been delayed or deterred by the unanimity rule, that result does not fall within any of the statutory tests. As they said: "The effect of the obligation [unanimity rule] on the public and on our commerce is the relevant test." Moreover, as both the Commission and the Examiner noted, disapproval at one meeting does not block further consideration of the proposal at the next meeting-as the history of the agents' commissions in this case indicates — and eventually ultimate agreement — as again the history here supports. The fact that the wishes of the majority may be blocked temporarily, or in an extreme case even permanently, by the unanimity rule is not in our view a sufficient reason under the statute for disapproval — failing some persuasive findings demonstrating detriment to the commerce of the United States. We do not find that here.
 
 
 12
 We must remand the order disapproving the unanimity rule to the Commission for reconsideration, with directions either to make supporting findings which adequately sustain the ultimate finding that the unanimity rule operates to the detriment of the commerce of the United States, or, if this cannot be done, to vacate that ultimate finding and approve the contract in this respect. Cf. Securities & Exchange Commission v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943); Bond v. Vance, 117 U.S.App.D.C. 203, 327 F.2d 901 (1964).
 
 
 13
 2. The Tieing Rule.
 
 
 14
 Although the Commission disapproved the tieing rule under 46 U.S.C. § 814, we are unable to find any ultimate factual conclusion within those specified in that section which would support its disapproval. That is, there is no finding that the rule is "unjustly discriminatory or unfair as between carriers, * * *," that it operates to the detriment of the commerce of the United States, or is contrary to the public interest, or is in violation of "this chapter." In the absence of such a specific finding, the rule is, by direction of Section 814, to be approved.
 
 
 15
 To be sure, the Commission may have relied on the criteria established by the Hearing Examiner as follows:
 
 
 16
 "Any provisions * * * [of the agreements or rules thereunder] which prevent travel agencies in the United States from rendering complete and effective service both to passengers and to ocean carriers operate to the detriment of the commerce of the United States. All conference-imposed restraints which prevent the travel agent from properly performing his function of selling ocean transportation, for which no reasonable justification exists, should be eliminated by the Commission's disapproval, cancellation, or modification of the subject agreements * * *."
 
 
 17
 But the Commission did not demonstrate or find that the tieing rule prevents travel agencies in the United States from rendering complete and effective service both to passengers and ocean carriers to the detriment of the commerce of the United States, nor did it find that the rule prevents the travel agent from properly performing his function of selling ocean transportation. It found that TAPC members carry 99% of the passengers moving by water across the Atlantic and that the non-conference cargo vessels must rely on travel agents for the sale of their 1% share of ocean transportation, but it did not find that non-conference vessels must rely on conference-appointed travel agents. It stated also that there is no evidence to demonstrate that TAPC would disintegrate without the rule. It pointed out that, although the principal economic threat to the conference lines is from the air carriers, the conference allows its appointed agents to sell air travel. But there is a complete lack of findings bringing the case within the criteria adopted by the Examiner, assuming for present purposes that such criteria are properly used to supplement the statutory provisions themselves.
 
 
 18
 The Examiner disapproved the tieing rule also, without stating his specific ground for disapproval in the statutory language. He pointed out that the purpose of the rule was an anti-competitive one — to keep non-conference vessels from booking passengers — but that the practice is not applied to sale of air transportation, the chief competition for the conference lines. The Examiner concluded that the tieing rule had not been shown to be necessary to promote stability in rates or to combat destructive competition, and that the need for the rule no longer exists, if it ever did.
 
 
 19
 We do not read the statute as authorizing disapproval of an agreement on the ground that it runs counter to antitrust principles, the theory on which seemingly the Commission's disapproval rests here. Many of the matters covered by conference rules are restrictive and even monopolistic in tendency. Yet, if the agreement is approved under 46 U.S. C. § 814, an exemption from the antitrust laws is specifically given by that section. The statutory language authorizes disapproval only when the Commission finds as a fact that the agreement operates in one of the four ways set out in the section by Congress.[9] See the dissent of Commissioner Patterson, joined by Commissioner Day, on this point, emphasizing that the need for the rule from a competitive standpoint has not been made a standard for approval or disapproval by the statute.
 
 
 20
 Since there is no finding here that the tieing rule operates in any one of the four ways which Congress prescribed in 46 U.S.C. § 814 for disapproval, we must return the case to the Commission. Such a finding is not for us to make. Accordingly, we remand for the purpose of reconsideration, with directions that either an adequately supported ultimate finding be made which warrants disapproval under the statute, or if no such finding can be made on the record, that the tieing rule be approved as directed by 46 U.S.C. § 814.
 
 
 21
 So ordered.
 
 
 
 Notes:
 
 
 [1]
 TAPC consists of two American-flag carriers and 23 foreign-flag carriers. APC consists of three American-flag carriers and 22 foreign-flag carriers
 
 
 [2]
 The Report says in part at page 4:
 "The history of ocean shipping proves beyond peradventure that these competitive rigors are so potentially violent that when unleashed almost invariably they destroy the requisite dependability, regularity and nondiscriminatory nature of ocean common carriage.
 "For many years all of the maritime nations of the world, including the United States, have realized that the inevitable monopolistic and discriminatory nature of rate-war competition among the ocean common carriers serving their foreign commerce, justified the formation of conferences so that the carriers may limit or regulate competition between or among themselves."
 
 
 [3]
 Chairman Boyd there said:
 "IATA [International Air Transport Association, an organization somewhat similar to the Conferences presently before us] will continue to be the machinery for developing fares and rates. * * * This will be true whether or not the unanimity voting rule continues to apply as it has in the past. This rule, originally adopted and insisted upon by the United States to protect each carrier's right of individual action, admittedly has its deficiencies. However, I am inclined to conclude these are less than those which would stem from a form of majority vote."
 
 
 [4]
 The text of Section 814, as amended, reads, insofar as here pertinent, as follows:
 "Every common carrier by water, or other person subject to this chapter, shall file immediately with the Commission a true copy, or, if oral, a true and complete memorandum, of every agreement with another such carrier or other person subject to this chapter, or modification or cancellation thereof, to which it may be a party or conform in whole or in part, fixing or regulating transportation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; controlling, regulating, preventing, or destroying competition * * *. The term `agreement' in this section includes understandings, conferences, and other arrangements.
 "The Commission shall by order, after notice and hearing, disapprove, cancel or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest, or to be in violation of this chapter, and shall approve all other agreements, modifications or cancellations. * * *
 * * * * *
 "Every agreement, modification, or cancellation lawful under this section, or permitted under section 813a of this title, shall be excepted from the provisions of sections 1-11 and 15 of Title 15, and amendments and Acts supplementary thereto."
 
 
 [5]
 There is no merit in the point that the Commission is without power to disapprove an agreement which has been previously approved. The statute quoted above in footnote 4 expressly confers the power to do so, provided the Commission finds that the agreement does one of the four things named in the statute as grounds for disapproval. But where the disapproval follows a history of prior approvals, as here, see the dissent of Commissioner Patterson concurred in by Commissioner Day, we think that the finding should be scrutinized by a reviewing court with greater care
 
 
 [6]
 The greater time required to handle steamship bookings results, as the Commission pointed out, in a lower "effective" commission rate than that of the airlines
 
 
 [7]
 Although the Commission did not refer to it, the record shows that sales of transportation on steamship lines have been increasingly adversely affected by the preference of many travelers for air transportation. As the Examiner noted, this preference is due in part to the pushing of air travel by agents in their own interests, and in part to the saving of travel time, particularly on jets, extensive advertising by airlines, and other factors
 The Commission found, moreover, that "differences between [conference] members over agents' commissions are usually eliminated or compromised, the minority giving way eventually to the majority." And the Examiner found, based on testimony which the Commission seems to have credited, that in view of the small minority of American-flag lines in the conference, the unanimity rule in this respect is "of substantial value to the American-flag lines" preventing "travel agents from playing one line against another." The Commission noted, however, that "American lines have often been in the vanguard for commission increase and as near as can be determined have never blocked proposed increases."
 
 
 [8]
 The Commission refers to instances where there has been a diversion from sea to air passage by non-appointed agents "against the best interest of the prospective passengers." While the Commission recognized that the non-appointed agents did not owe any duty to the conference lines, it stated that the diversion was not in the interests of the conference lines themselves. That probably is so, but it has little relevance in connection with the unanimity rule in this context
 
 
 [9]
 This is not to say of course that the Commission must completely separate itself from antitrust principles in determining whether an agreement operates detrimentally to United States commerce, or against the public interest, or unfairly as between carriers, or in violation of the Shipping ActCf. Isbrandtsen Co. v. United States, 93 U.S.App.D.C. 293, 299, 211 F.2d 51, 57, cert. denied sub nom. Japan-Atlantic & Gulf Conference v. United States, 347 U.S. 990, 74 S.Ct. 852, 98 L.Ed. 1124 (1954), where we pointed out that the prohibitions of the antitrust laws are not to be invaded "any more than is necessary to serve the purposes" of the Shipping Act.