364 F.2d 696
 124 U.S.App.D.C. 303
 U.S. ATLANTIC & GULF/AUSTRALIANEW ZEALAND CONFERENCE, Petitioner,
v.
FEDERAL MARITIME COMMISSION and United States of America,
Respondents, Dow Chemical Co. and Dow Chemical
International, Port of New York, Authority, The North
Atlantic Ports Association Traffic Board, Intervenors.
U.S. ATLANTIC & GULF/AUSTRALIANEW ZEALAND CONFERENCE, Petitioner,
v.
FEDERAL MARITIME COMMISSION and United States of America,
Respondents, The Dow Chemical Company and Dow
Chemical International, S.A., Intervenor.
 Nos. 19637, 19704.
 United States Court of Appeals District of Columbia Circuit.
 Argued April 21, 1966.
Decided June 30, 1966.
 
 Mr. Elmer C. Maddy, New York City, with whom Mr. Ronald A. Capone, Washington, D.C., was on the brief, for petitioner.
 Mr. Jerry Z. Pruzansky, Attorney, Department of Justice, of the bar of the Supreme Court of Illinois, pro hac vice, by special leave of court, with whom Asst. Atty. Gen. Donald F. Turner, Messrs. James L. Pimper, General Counsel, Federal Maritime Commission, Walter H. Mayo, III, Attorney, Federal Maritime Commission, and Irwin A. Selbel, Attorney, Department of Justice, were on the brief, for respondents.
 Mr. Jerome H. Heckman, Washington, D.C., with whom Mr. Robert R. Tiernan, Washington, D.C., was on the brief, for intervenor Dow Chemical Co., and Dow Chemical International
 Messrs. Arthur L. Winn, Jr., S. H. Moerman, J. Raymond Clark and James M. Henderson, Washington, D.C., were on the brief, for intervenors Port of New York Authority and The North Atlantic Ports Ass'n Traffic Board. Mr. Gordon P. MacDougall, Washington, D.C., also entered an appearance for intervenors, Port of New York Authority and The North Atlantic Ports Ass'n Traffic Board.
 Before WILBUR K. MILLER, Senior Circuit Judge, McGOWAN and LEVENTHAL, Circuit Judges.
 
 McGOWAN, Circuut Judge:
 
 1
 These statutory review petitions bring before us the action of the Federal Maritime Commission in enlarging the scope of one of the ocean carrier conferences existing under the Shipping Act of 1916. Section 15 of that statute, 46 U.S.C. 814, contemplates that competitiors may, with the Commission's prior approval, engage in concerted activities with respect to rates and other aspects of the service they offer. Petitioner is such a shipping conference created under an approved agreement. It is composed of six carriers serving between Atlantic and Gulf ports of the United States, on the one hand, and Australia and New Zealand ports, on the other.
 
 
 2
 The validity of this approved conference agreement as it relates to this trading area is not in issue. What petitioner complains of are certain limitations placed by the Commission upon petitioner's effort to enlarge its agreement by amendment to include Great Lakes and St. Lawrence ports. We do not now decide that the Commission could in no event have properly done what it did. We do hold that, in respect of two of the three major points pressed upon us by petitioner, the Commission's findings are inadequate to support affirmance on this review; and we remand for further proceedings by the Commission consistent with what is said hereinafter.
 
 
 3
 * With the opening of the St. Lawrence Seaway in 1959, the significance of the Great Lakes as the origin and destination of seaborne traffic was materially increased. Ports on the Lakes provide competitive alternatives to Atlantic and Gulf ports, and some shippers use both. The location of the Lakes gives rise to both advantages and disadvantages in this competition. Shippers on or near the Lakes save the cost of inland trans-portation to the Atlantic and Gulf ports; and this is a considerable factor. But the disadvantages are, first, the closing of the Lakes to navigation during five or six months of the year; and, second, the longer sailing time required to make the voyage from, for example, Chicago to Sydney as compared with New York to the same destination.
 
 
 4
 Three of the six members of the U.S. Atlantic & Gulf/Australia-New Zealand Conference conceived a purpose to serve the ports on the Lakes as well. Only one had actually engaged in such trade prior to the hearing in this case, and it found the volume so slender as to make it necessary to try to fill out its cargoes by calls at Canadian ports in the St. Lawrence and U.S. Atlantic ports as well. Independent carriers-- not members of the Conference-- have provided the most formidable competition for the trade between the Lakes and the Antipodes.
 
 
 5
 The amendment proposed by petitioner to the Conference agreement sought to extend its coverage to the Lakes and the St. Lawrence. It created a Great Lakes Section within the Conference. Carriers maintaining regular service from and to the Lakes would be eligible for membership in the Section. Action by the Section on rates was made dependent upon a 3/4 vote of its members, although the Conference agreement required only a 2/3 vote on the setting of rates. The amendment also provided that, if the Section fixed rates at levels less than those offered at the Atlantic and Gulf ports, the prior assent of the entire Conference would have to be obtained. Lastly, the amendment encompassed the extension to the Lakes of the dual rate contract arrangements operative in respect of the Atlantic and Gulf. Under a dual rate system, which is made legally possible by Section 14b of the Act, lower rates are available to the shipper who contracts to give all his business to conference carriers.
 
 
 6
 The examiner who presided over the hearing recommended approval of the proposed amendment. Exceptions were filed by a major chemical company in the Lakes region, a Montreal carrier contemplating service between the Lakes and Australia, and the Commission's Hearing Counsel. The Commission approved the amending agreement to the extent that it enlarged the trading area of the Conference by creating the Great Lakes Section. Its reason for doing so was that of administrative economy; it believed that a single conference administration for 'separate trade areas,' to use its own phrase, was justified by the savings in administrative costs. It disapproved, however, of the provisions in the amendment for (1) a 3/4 vote on rates in the Great Lakes Section, (2) the requirement of Conference consent to Section rates lower than Atlantic and Gulf rates, and (3) the extension of the Conference's dual rate system to the Lakes. It is these limitations upon the Commission's approval which petitioner attacks here.
 
 
 7
 No one is before us urging that the Commission is wholly lacking in authority to put two competitive trading areas in the same conference, even for administrative cost-sharing purposes. There are perhaps means by which this last could be achieved short of what is at least in form an enlargement of the Conference. In any event, we doubt that petitioner was motivated to amend its agreement by any burning desire to reduce office overhead, although that would appear to be about all the Commission gave it. We are not clear whether it is the Commission's real belief that it lacks authority under the statute to do more than that in the case of separate trading areas circumstanced as these are here. We venture no view on that question since no one has asked us to; and we proceed to address ourselves to the issues in the framework in which they have been presented to us, that is to say, whether the Commission's actions complained of here are adequately supported by its findings, bearing in mind that, where findings are otherwise adequate, our function is limited to seeing whether there is substantial support for them in the record. Consolo v. FMC, 383 U.S. 607, 618-620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966).
 
 II
 
 8
 We turn first to the Commission's rejection of the proposed extension of dual rate system. Petitioner argued to the Commission that the threat of competition on the Lakes from non-conference carriers justified this provision; and that it would have the further advantage of discouraging Atlantic and Gulf shipper-signatories from getting around the contract by sending their goods to the Lakes. The Commission recognized the first point to the extent of indicating its willingness to approve a separate dual rate contract for the Lakes. But it stated its belief to be that the inclusion of the two trading areas under the existing contract system applicable to the Atlantic and Gulf would, within the meaning of Sections 14b and 15 of the Shipping Act, be (1) detrimental to the commerce of the United States, (2) discriminatory vis-a-vis the Lakes, and (3) contrary to the public interest. Its reasons for this finding are set forth in the quotation from its opinion contained in the margin.[1] We cannot say that this conclusion is arbitrary or lacking in substantial support in the record. See The Dual Rate Cases, 8 F.M.C. 16 (1964), remanded on other grounds, sub. nom. Pacific Coast European Conference v. United States, 9 Cir., 350 F.2d 197, cert. denied, 382 U.S. 958, 86 S.Ct. 433, 15 L.Ed.2d 362 (1965).
 
 
 9
 The rationality of the Commission's disapproval of the 3/4 voting requirement within the Section is not, however, so readily apparent. The Commission's discussion of this matter is as sparing in detail as it is flat in conclusion. After noting that the record disclosed three carriers as potential members of the Section, the Commission observed that the 3/4 requirement 'permits one carrier to exercise a practical veto over the rate making decisions of that section. We cannot approve such an agreement * * *.' This says no more to us than that, where unanimity is made the order of the day, approval must be withheld. In particular, the Commission does not identify which one or more of the statutory standards is transgressed by this provision; and those standards are embedded in a statute which says in terms that the Commission shall disapprove those agreements which conflict with the enumerated standards 'and shall approve all other agreements, modifications or cancellations.'[2]
 
 
 10
 The statute in no way proscribes unanimity as such, and the question remains one of whether a unanimity requirement in a particular case is incompatible with some one or more of the concerns of Congress exhibited in the statute. There are no findings by the Commission in this regard and, without them, we cannot say that the Commission acted within its range of allowable discretion. As was done by us not long ago in another matter coming to us from the Commission and involving a unanimity requirement in a conference agreement, we remand to the Commission for reconsideration. Aktiebolaget Svenska Amerika Linien (Swedish-American Line) v. FMC, 122 U.S.App.D.C. 59, 351 F.2d 756 (1965).
 
 
 11
 We also have difficulties with the Commission's handling of the proposal that the Conference as a whole be required to assent to any Section rate which is below an Atlantic or Gulf rate. The Commission expressed doubts about the merits of this feature of the amendment, but it appeared to conclude that it (the Commission) was, in any event, expressly disabled from approving the agreement by virtue of that part of Section 15 of the Shipping Act which provides that:
 
 
 12
 'No such agreement shall be approved, nor shall continued approval be permitted for any agreement (1) between carriers not members of the same conference or conferences of carriers serving different trades that would otherwise be naturally competitive, unless in the case of agreements between carriers, each carrier, or in the case of agreements between conferences, each conference, retains the right of independent action * * *.'
 
 
 13
 The Commission said in effect that, at least for purposes of this sentence, the carriers serving the Lakes and the carriers serving only the Atlantic and Gulf ports would not be members of the same conference.
 
 
 14
 This issue, and the Commission's approach to it, underline the ambivalence which we noted earlier. The Commission approves the enlargement of the Conference to include the separate trading area of the Lakes, and then says that, as a matter of law, these are really two conferences for purposes of the independent action requirement of the statute. There is a logical untidiness about all this which does not contribute to clarity and orderliness in statutory interpretation. We are inclined to think that, simply as a matter of statutory construction, the Commission cannot have it both ways. It may not, on the one hand, approve the inclusion of the Lakes in the Conference, and then, on the other, say that it cannot even consider the consent provision on its merits because the Act forbids such a provision in an agreement between two conferences.
 
 
 15
 The Commission now says to us that, even if it was wrong in its reading of the statute, its disapproval in this instance does not rest solely upon its assumed lack of power to approve under any circumstances. It points to the discussion in its opinion which ends with the statement that 'we believe the vesting of rate-making decisions in carriers who do not serve the area in whose rates they have a voice to be far more dangerous to the commerce of the United States than the existence of rate competition between two competing areas.' This, we readily concede, approaches quite closely to a finding that this provision of the proposed agreement will, in the language of the statute, 'operate to the detriment of the commerce of the United States * * *.' And, if clearly intended to be such a finding, there is arguably adequate support in the record for it. But it is not absolutely certain from the context that the Commission intended its comments in this regard to be a definitive finding within the scope of Section 15 for, in the next breath, it referred to its lack of authority in law to approve the arrangement, whatever its merits or demerits. Since this case is to be remanded for another purpose, we think it well to expand the remand to enable the Commission to pass upon this point again, disabused of any notion that the statute dictates automatic disapproval.
 
 
 16
 For the purposes hereinabove indicated, this case is remanded to the Commission.
 
 
 17
 It is so ordered.
 
 
 
 [1]
 'Since the Great Lakes are closed to navigation during a five- or six-month period, it is rare that a shipper in that area can rely upon carriers from the Lakes for all his shipping requirements. At some time during the year, he will have no choice but to ship out of the Atlantic or Gulf. Therefore, a shipper in the Lakes area may elect to sign a dual rate contract from the Atlantic and Gulf range. If the shipper elects to sign a dual rate contract from the Atlantic and Gulf, he would be compelled, under the conference proposal, to be a dual rate shipper from the Lakes whether or not conference rates and service in the Lakes are satisfactory to him. One dual rate contract covering both the Atlantic and Gulf as well as the Lakes would also effectively lessen the bargaining power of Great Lakes shippers since they would be forced to accept conference rates from the Lakes or conference rates from the Atlantic and Gulf although satisfactory service could otherwise be obtained in the Lakes. This situation is harmful not only to the shipper, but to the development of the Great Lakes as a trading area. The extension would hinder Lakes development and would in fact contribute to the diversion of cargo from the Lakes. For example, a shipper might be required to use unsatisfactory conference service from the Lakes or move cargo overland to the Atlantic or Gulf, even though satisfactory nonconference service might be available in the Lakes. This is discriminatory to Lakes ports.'
 
 
 [2]
 The critical language in Section 15 is as follows:
 The Commission shall by order, after notice and hearing, disapprove, cancel or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest, or to be in violation of this chapter, and shall approve all other agreements, modifications or cancellations.