**PACIFIC COAST EUROPEAN CONFERENCE and its Member Lines, Petitioners,**

v.

**The FEDERAL MARITIME COMMISSION**

and

**United States of America, Respondents.**

**No. 20195.**

United States Court of Appeals District of Columbia Circuit.

Argued Dec. 21, 1966.

Decided March 31, 1967.

Petition for Rehearing Denied May 11, 1967.

Mr. Leonard G. James, San Francisco, Cal., of the bar of the Supreme Court of California, pro hac vice, by special leave of court, with whom Mr. Charles F. Warren, Washington, D. C., was on the brief, for petitioners. Mr. Robert L. Harmon, Chicago, Ill., also entered an appearance for petitioners.

Mr. Walter H. Mayo, III, Attorney, Federal Maritime Commission, with whom Asst. Atty. Gen. Donald F. Turner, Messrs. James L. Pimper, General Counsel, Robert N. Katz, Solicitor, Federal Maritime Commission, Irwin A. Seibel and Milton J. Grossman, Attorneys, Department of Justice, were on the brief, for respondents.

Before EDGERTON, Senior Circuit Judge, McGOWAN, and TAMM, Circuit Judges.

McGOWAN, Circuit Judge:

Petitioners, an ocean shipping conference and its member lines (the "Conference"), attack an order of the Federal Maritime Commission withdrawing approval, under Section 15 of the Shipping Act of 1916 (46 U.S.C. § 801 et seq.), of the agreement creating the Conference. Although this order is the immediate object of this statutory review proceeding, the Conference's challenge centers upon an earlier order of the Commission issuing from general rule-making proceedings. The claim essentially is that, because the Commission disapproved the agreement by reference to the requirements of the rule, the order terminating approval must be set aside. We disagree; and we affirm the order before us.

I

In 1961 Congress amended the Shipping Act of 1916 in several significant respects. Not the least of these involved Section 15, which had for years been the source of antitrust immunity for concerted rate action by groups of competitive steamship companies. This immunity could be achieved by securing Commission approval of the agreement creating a conference. One of the principal pressures giving rise to the 1961 amendments was a wide-spread dissatisfaction with

the terms upon which antitrust immunity could be gained, and a considerable apprehension that the public interest was not adequately protected in this regard.

█ The relevant paragraph of Section 15 as it emerged from the Congressional review is set out in the margin, with denotation by emphasis of the new provisions.[1] Crucial for present purposes among the latter is the concluding clause referring to "reasonable and equal terms and conditions" for admission to conference membership. Also of central importance in the 1961 amendments is the decision by Congress to give the Commission vastly enlarged rule-making power. This was reflected in a new Section 43, which stated simply that the Commission "shall make such rules and regulations as may be necessary to carry out the provisions of this chapter."[2]

The Commission moved promptly to use the one to define the other. In March of 1962, the Commission issued a notice of proposed rule-making with respect to admission to, and withdrawal and expulsion from, shipping conferences. 27 Fed.Reg. 2646. The Commission received comments upon its proposed rules, revised them, and republished the revised rules, inviting further comments. 28 Fed.Reg. 13369–70. After these were received, the Commission heard oral argument. On May 1, 1964, General Order 9 was forthcoming from the Commission. 29 Fed.Reg. 5797. It set out nine provisions which the Commission found to be necessary for inclusion in conference agreements in order to qualify those agreements under the statute as containing "reasonable and equal terms and conditions" with respect to admission and readmission to conference membership. A 60-day grace period was provided for the amendment of existing agreements in order to bring them into compliance with the new rules.

The Conference participated fully in the rule-making proceeding leading to General Order 9. After that order came out, it did nothing about amending its agreement. When an inquiry came from the Commission some months after the grace period had expired, the Conference represented that it was in compliance.

1. "The Commission shall by order, after notice and hearing, disapprove, cancel or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest, or to be in violation of this chapter, and shall approve all other agreements, modifications, or cancellations. *No such agreement shall be approved, nor shall continued approval be permitted for any agreement (1) between carriers not members of the same conference or conferences of carriers serving different trades that would otherwise be naturally competitive, unless in the case of agreements between carriers, each carrier, or in the case of agreement between conferences, each conference, retains the right of independent action, or (2) in respect to any conference agreement, which fails to provide reasonable and equal terms and conditions for admission and readmission to conference*

*membership of other qualified carriers in the trade, or fails to provide that any member may withdraw from membership upon reasonable notice without penalty for such withdrawal."* 46 U.S. C. § 814 (1964).

2. 46 U.S.C. § 841a (1964). The legislative history is clear that Congress intended to clothe the Commission with a broad authority in this regard, going well beyond what it had possessed before. See, *e. g.*, Alcoa Steamship Co. v. FMC, 121 U.S.App.D.C. 144, 148, 348 F.2d 756, 760 n. 27 (1965). The Senate Committee on Commerce in its report on the amending measure said:

A new section 43 would be added to the Shipping Act, 1916, to require the Commission to make such rules and regulations as may be necessary to carry out the provisions of the Shipping Act, 1916, as amended. This would broaden considerably the Commission's rulemaking power as originally outlined in the bill. We have made this change at the urgent request of the Commission and despite the objections of certain carriers.

S.Rep.No. 860, 87th Cong., 1st Sess. 20, U.S.Code Cong. & Admin.News 1961, p. 3108 (1961).

The Commission demurred to this, and directed the Conference to submit a proper amendment. The Conference responded that its agreement "is lawful in every respect, and that it continues lawful unless and until it can be disapproved upon proper, specific findings, as set forth in Section 15 of the Shipping Act." The Commission thereupon called upon the Conference to show cause why approval of its agreement should not be withdrawn. Five particulars were specified in which it was charged that the agreement did not comply with Section 15, as implemented by General Order 9.[3] The procedure designated by the Commission to dispose of the show cause order was that the Conference might submit affidavits of fact and memoranda of law, the Commission's Hearing Counsel might reply, and the Commission would hear oral argument. The Conference was, as it turned out, also permitted to reply to Hearing Counsel's memorandum.

The Commission in its Report disapproving the agreement dealt both with the deficiencies in the agreement under General Order 9, and with the propriety of its having proceeded by means of General Order 9 in withdrawing its approval under Section 15. One Commissioner, although having dissented originally from General Order 9, stated his view to be that the Conference was making a collateral attack upon that order which the Commission should not entertain. In its petition to the Commission for rehearing, the Conference made clear that it considered the validity of General Order 9 to be directly in issue.

## II

As before the Commission in the show-cause proceeding, so here the Conference's focus of attack is General Order 9.[4] Its argument is essentially this: At least in the case of a long-standing agreement which has been previously approved under Section 15, the Commission cannot terminate that approval except by reference to the standards of Section 15 itself, and only then after evidentiary hearing and upon precise findings as to the particulars in which the agreement is in conflict with those standards. It is not enough for the Commission to appraise the agreement in the light of requirements which it has formulated by rule, and to declare the agreement deficient if it falls short of any of those requirements. Since those requirements have

3. "(a) There is no provision for furnishing a detailed statement of the reasons for expulsion to the party expelled (Section 523.2(i)).
 (b) There is no provision that applications for membership shall be acted upon promptly (Section 523.2(b)).
 (c) 'Just and reasonable cause' for denial of admission to membership does not comply with the requirements of General Order No. 9 (Section 523.2(e)).
 (d) There is no provision for 'prompt' notification to the Commission of the admission of new members (Section 523.2(d)).
 (e) There is no provision for advice to the Commission of the conference's denial of membership to any line (Section 523.2(e))."

4. There might well be a threshold issue as to whether, looking to the nature of the Conference's attack upon General Order 9, the court has jurisdiction to resolve such a matter now. The thrust of the Conference's position would appear not really to be that its agreement does in fact comply with General Order 9, but rather that General Order 9 was invalid from the moment of issuance as beyond the Commission's authority. So viewed, there is much to be said for early invocation of judicial authority to set this basic contention at rest. The Government, however, has not raised this question and, indeed, at oral argument expressly disclaimed it upon inquiry from the court. Under these circumstances, and in view of the conclusion we reach on the merits, we do not pursue the matter further.

The record also reveals the possibility of a second preliminary issue relating to the Conference's standing to pursue this appeal. On April 22, 1966, the Conference in fact submitted "under protest," whatever the legal effect of such a caption may be, duly executed amendments to its agreement. That these were responsive to the Commission requirements is indicated by its approval of the Conference agreement, as so amended, on June 9, 1966. Again, however, the Government makes no suggestion of mootness.

not been set forth by Congress *in haec verba* in Section 15, the agreement cannot be said to be in conflict with Section 15.

This contention has the antique virtues of simplicity and straight-forwardness. The difficulty is that it is a doctrinal archaism in modern administrative law. It comes, indeed, at a time when many knowledgeable voices have been urging the agencies to make greater, rather than less, use of their rule-making authority in the interest of more precise definition of decisional standards.[5]

When Congress in 1961 decided to invest the Commission with broad rule-making power, it acted in a solidly established tradition, and one which bears unmistakably the judicial stamp of approval.[6] In the Administrative Procedure Act, Congress was at great pains to specify the procedural safeguards which should attend upon its employment. 5 U.S.C. § 1004(a) (1964). There is no procedural issue raised by the Conference here with respect to the processes followed by the Commission in promulgating General Order 9. The claim is only that the Commission could not, by general rule-making, articulate enforceable standards which it could thereafter apply to particular agreements subject to Section 15. We reject that claim as wholly out of keeping with the Congressional purpose underlying the grant of authority contained in Section 43.

## III

The Conference would not be foreclosed from relief if either (1) its agreement was in fact in substantial compliance with General Order 9, or (2) the five specifications of General Order 9 here in issue fell outside the permissible range of Commission rule-making in respect of the definition of what, in the statutory phrase, are "reasonable and equal terms and conditions" relating to conference membership. We are unable to find that the Conference has seriously claimed the former on this appeal. Its preoccupation here, as at the Commission level, was with its assertion that, although the provisions of the agreement were not substantially the same as those called for in General Order 9, the Commission must make specific findings as to the respects in which they fell below the standards literally to be found within the four corners of Section 15. This is, of course, merely another way of stating the denial of the Commission's power to proceed by rule-making. It is not a true claim that, conceding the validity of General Order 9, the Conference agreement, rightly viewed, conforms to it. The reason that claim is not pressed is suggested by an inspection of the text of the agreement, on the one hand, and General Order 9, on the other. See Note 4, *supra*, in which reference is made to the even-

5. *E.g.*, FRIENDLY, THE FEDERAL ADMINISTRATIVE AGENCIES: THE NEED FOR BETTER DEFINITION OF STANDARDS 146–47 (1962); Baker, Policy by Rule or Ad Hoc Approach—Which Should it Be?, 22 LAW & CONTEMP.PROB. 658 (1957).

6. Securities & Exchange Comm'n v. Chenery Corp., 322 U.S. 194, 202–203, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). See Federal Power Comm'n v. Texaco, Inc., 377 U.S. 33, 34, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964); United States v. Storer Broadcasting Co., 351 U.S. 192, 202–205, 76 S.Ct. 763, 100 L.Ed. 1081 (1956). Cf. American Airlines, Inc. v. CAB, 123 U.S. App.D.C. 310, 359 F.2d 624 *(en banc)*, cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966). The Ninth Circuit has turned back a challenge to the Commission's use of rule-making not essentially unlike that made here. Pacific Coast European Conference v. United States, 350 F.2d 197, 203, cert. denied, 382 U.S. 958, 86 S.Ct. 433, 15 L.Ed.2d 362 (1965). And see our discussion of the Commission's broadened rule-making power in Alcoa Steamship Co. v. FMC, 121 U.S.App.D.C. 144, 149, 348 F.2d 756, 761 (1965). The Conference's heavy reliance upon our decisions in Aktiebolaget Svenska Amerika Linien v. FMC, 122 U.S.App. D.C. 59, 351 F.2d 756 (1965), and U. S. Atlantic & Gulf/Australia-New Zealand Conference v. FMC, 124 U.S.App.D.C. 303, 364 F.2d 696 (1966), is misplaced. In neither had the Commission acted by rule-making to give precision to the statutory standard.

tual amendment of its agreement by the Conference after proceedings were concluded at the Commission level.

The Conference does advance the second point, namely that General Order 9 goes beyond the bounds of permissible rule-making. The arguments in support of this proposition are something of a mixed bag. The Conference first appears to assert that the contract provisions mandated by General Order 9 are unnecessary because the Conference has no history of restrictive practices with respect to admission to membership. But the essence of rule-making is generality of application, and General Order 9 was not devised with this Conference alone in mind. Moreover, the Commission in rule-making is not confined to the redress of demonstrated evils as distinct from the prevention of potential ones. The Conference also suggests that, if General Order 9 is permitted to stand, it may, even though its impact upon the Conference be slight because of the latter's open membership policy, lead the Commission headily on to more arbitrary and dangerous rule-making ventures. But surely the possibility of abuse in the future does not establish present abuse; and the courts remain open for business.

Nowhere is it established that the nine specifications of General Order 9 have no relevance whatever to the Congressional concern that conference agreements provide "reasonable and equal terms and conditions" in respect of membership. In no respect is it demonstrated that those nine specifications are not reasonably adapted to the accomplishment of the Congressional objective of providing the shipping conference with freely swinging doors in respect of carrier membership. The recurring refrain is that the Commission must apply to the Conference agreement only the literal words of the statute, not those of the rule issued in aid of it. What is overlooked is that, where the rule does not transgress the authority under which it is issued, it is still the statute which speaks, and rule and statute may not be separated into alien elements as the Conference would have us do.

In its Report accompanying the order under review, the Commission articulated at some length the considerations which prompted General Order 9. Since the Conference does not really take issue with them directly, we need not reproduce them here. We think they amply conduce to a conclusion that the Commission in this instance has acted well within the authority entrusted to it by Congress.

Affirmed.