**KATHARINE GIBBS SCHOOL (INCOR-PORATED), et al., Petitioners,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

**Nos. 1123, 1124, 1126 to 1130, 1135, 1137 to 1139, 1141 and 1310, Dockets 78–4204, 78–4206, 78–4209, 78–4210, 78–4214, 78–4215, 79–4007, 79–4017, 79–4039, 79–4046, 79–4057, 79–4064 and 79–4073.**

United States Court of Appeals, Second Circuit.

Argued June 11, 1979.

Decided Dec. 12, 1979.

Rehearing En Banc Denied March 17, 1980.

Abe Fortas, James M. Johnstone, Washington, D. C., Steven J. Olson, St. Paul, Minn., Lewis M. Popper, Washington, D. C., for petitioners.

Gerald P. Norton, Washington, D. C., for respondent; General Counsel, F.T.C., Washington, D. C., on brief.

Linden & Deutsch, New York City, on brief, for petitioners Katharine Gibbs School (Incorporated) and Katharine Gibbs School-Huntington, Inc.

Rogin, Nassau, Caplan, Lassman & Hirtle, Hartford, Conn., on brief, for petitioner Computer Processing Institute.

William H. Cusick, McGraw-Hill, Inc., New York City, on brief, for petitioner McGraw-Hill, Inc.

Rogers & Wells, New York City, on brief, for petitioner Berkeley School of Westchester, Inc.

Mataraso & Macaffer, Albany, N. Y., on brief, for petitioner Albany Business College, Inc.

Fortas & Koven, Washington, D. C., on brief, for petitioner National Home Study Council.

Wald, Harkrader & Ross, Sachs, Greenbaum & Taylor, Washington, D. C., on brief, for petitioner Association of Independent Colleges and Schools.

Kirkland & Ellis, Bernard H. Ehrlich, Washington, D. C., on brief, for petitioners National Association of Trade and Technical Schools and National Association of Cosmetology Schools.

Dechert, Price & Rhoades, Philadelphia, Pa., on brief, for petitioner National Association of Cosmetology Schools.

Oppenheimer, Wolff, Foster, Sheppard & Donnelly, St. Paul, Minn., on brief, for petitioner Control Data Corporation.

Baker & Hostetler, Washington, D. C., on brief, for petitioner Cleveland Institute of Electronics, Inc.

Before VAN GRAAFEILAND and NEWMAN,* Circuit Judges, and BONSAL, District Judge.**

VAN GRAAFEILAND, Circuit Judge:

Twelve petitions have been filed with this Court seeking review of a Trade Regulation Rule issued by the Federal Trade Commission on December 18, 1978, entitled "Proprietary Vocational and Home Study Schools." See 16 C.F.R. § 438.[1] The Rule's broadly stated purpose, as set forth in the Commission's Statement of Basis and Purpose,[2] is "to alleviate currently abusive practices against vocational and home study school students and prospective students." Although the Rule does not define "abusive practices", the Commission's Statement of Basis and Purpose shows that the Commission's concern was with unfair and deceptive advertising, sales, and enrollment practices engaged in by some of the schools. See 43 Fed.Reg. at 60802.

The more than 7,000 proprietary vocational schools that will be covered by the Rule on its January 1, 1980, effective date are no strangers to regulation. Almost every State has legislation aimed at eliminating some or all of the abuses that trouble the Commission. The United States Veterans Administration and Office of Education have also been active in this area. In 1972, the Commission itself issued a set of guidelines for private vocational and home study schools, see 16 C.F.R. § 254, and has since instituted proceedings against several schools under section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45.

The Commission decided, however, that all of the foregoing regulatory efforts were inadequate, and, in 1974, it published for comment and public hearing a proposed Trade Regulation Rule. The Commission proceeded originally under the rulemaking power granted it in section 6(g) of the Federal Trade Commission Act, 15 U.S.C. § 46(g), which in National Petroleum Refiners Association v. FTC, 482 F.2d 672, 157 U.S.App.D.C. 83 (D.C.Cir. 1973), cert. denied, 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974), was held broad enough to permit the issuance of substantive as well as procedural rules. However, on January 4, 1975, in the midst of the Commission's hearings, Congress passed the Magnuson-Moss Warranty—Federal Trade Commission Improvement Act, Pub.L.No.93-637, 88 Stat. 2183, Title II of which prescribes with preciseness the Commission's authority to issue rules and general statements of policy and outlines the rulemaking procedures to be followed in connection therewith. See 15 U.S. C.A. § 57a (Supp.1979). Following enactment of this legislation, the Commission changed its hearing procedures to comply with the new statutory requirements. Our primary task on this appeal is to determine whether the Rule finally adopted was within the general powers of the Commission under the Federal Trade Commission Act as refined and limited by the specific provisions of section 57a and, if so, whether the Rule was supported by substantial evidence and was neither arbitrary nor capricious.

Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a), declares that "unfair or deceptive acts or practices in commerce" are unlawful, and section 6(g)

---

* Honorable Jon O. Newman was a United States District Judge for the District of Connecticut, sitting by designation at time of oral argument.

** Honorable Dudley B. Bonsal, United States District Judge, Southern District of New York, sitting by designation.

1. Petitioners are Katharine Gibbs School (Incorporated), Computer Processing Institute, The Berkeley School of Westchester, Inc., Albany Business College, Inc., Katharine Gibbs School-Huntington, Inc., McGraw-Hill, Inc., National Home Study Council, Association of Independent Colleges and Schools, National As-

sociation of Trade and Technical Schools, National Association of Cosmetology Schools, Control Data Corporation and Cleveland Institute of Electronics, Inc.

Amicus briefs have been filed by the Council on Post-secondary Accreditation, Accredited Proprietary and Occupational Schools of Connecticut, and National Association of State Administrators and Supervisors of Private Schools.

2. The Statement of Basis and Purpose is reprinted at 43 Fed.Reg. 60795–60817.

empowers the Commission to make rules and regulations for the purpose of carrying out this provision. Section 57a(a)(1) redefines this grant of authority by providing that the Commission may prescribe:

(A) interpretive rules and general statements of policy with respect to unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 45(a)(1) of this title), and

(B) rules which define with specificity acts or practices which are unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 45(a)(1) of this title). Rules under this subparagraph may include requirements prescribed for the purpose of preventing such acts or practices.

The Magnuson-Moss Act also provides that, after any Commission rule takes effect, a violation thereof shall be an unfair or deceptive act under 15 U.S.C. § 45(a)(1) unless the Commission otherwise provides. 15 U.S.C. § 57a(d)(3). It empowers the Commission to commence a civil action for a violation of any rule, in which action the Commission may seek, among other remedies, rescission or reformation of contracts, the refund of money or the return of property, and money damages. 15 U.S.C. § 57b(b).

 Petitioners contend, and we agree, that in order to comply with section 57a(a)(1)(B) the Commission must define with specificity in the Rule those acts or practices which are unfair or deceptive and may include requirements for preventing them. Petitioners contend further, and again we agree, that the challenged Rule does not comply with these statutory provisions. Instead of defining with specificity those acts or practices which it found to be unfair or deceptive, the Commission contented itself with treating violations of its "requirements prescribed for the purpose of preventing" unfair practices as themselves the unfair practices.[3] We think that Congress expected more than this.

Requirements designed to prevent unfair practices are predicated upon the existence of unfair practices. These unfair practices, which are the statutorily required underpinning for the Commission's "requirements", should have been defined with specificity. "Because the prohibitions of section 5 of the Act are quite broad, trade regulation rules are needed to define with specificity conduct that violates the statute and to establish requirements to prevent unlawful conduct." Conf.Rep.No.93–1408, Joint Explanatory Statement of the Committee of Conference, *reprinted in* [1974] U.S.Code Cong. & Ad.News, pp. 7702, 7755, 7763.

The statute requires that the Commission's Statement of Basis and Purpose, which must accompany a Rule, shall include statements as to the prevalence of the acts or practices treated by the Rule and the manner in which such acts or practices are unfair or deceptive. 15 U.S.C. § 57a(d)(1). These provisions would be meaningless if the only unfair acts or practices defined in the Rule were possible future violations of its remedial requirements.

We conclude that the Commission erred in failing to comply with the procedural requirements of section 57a(a)(1)(B). We also find several substantive provisions of the Rule to be defective, and the combination of procedural and substantive errors requires that the Rule be set aside. We will remand the Rule to the Commission so that the Commission may comply with section 57a(a)(1)(B) and delete or amend those provisions which we find to be improper.

In the paragraphs that follow, we deal with petitioner's additional claims of error.

## I

## THE REFUND PROVISIONS

Instead of defining with specificity the advertising, sales, and enrollment practices it deemed unfair and deceptive and setting forth requirements for preventing them, the Commission decided to make it finan-

---

**3.** The Commission's Rule provides simply that it is an unfair or deceptive act or practice for any school to fail to comply with the requirements of the Rule. 16 C.F.R. § 438.0.

cially unattractive for schools covered by the Rule to accept a student who, for any reason whatever, was unlikely to finish the course in which he or she had enrolled. The Commission did this by directing its attack against the tuition refund policies of the schools.

Although the Commission concededly did not find that existing refund policies were either unfair or deceptive, *see* 43 Fed.Reg. at 60809, it directed that they be completely revised so as to make them financially more onerous for the schools. This the Rule accomplishes by requiring schools to make refunds on a strict pro rata basis, the percentage of the refund to be determined by matching the number of classes attended or lessons completed against the total of classes, hours, or lessons required to complete the course. *See* 16 C.F.R. § 438.4. Refunds on such a pro rata basis do not take into account those costs that are fixed at the time of enrollment, such as salaries for teachers and staff, classroom and boarding facilities, administration overhead, books, and supplies. The Rule does not require a student to return "records, tapes, slides, films, books or any other written course materials" as a condition of obtaining a refund. *Id.* § 438.1(u); *see id.* § 438.4. The cost of other equipment furnished a student must be prorated in the same manner as tuition, unless a separate equipment charge is made in the enrollment contract. Even if a separate charge is made, it will be refunded on a pro rata basis if the equipment is returned, regardless of its then condition or usability. *Id.* § 438.4(c)(2). Although the Commission did not fault existing refund policies, it provided, nonetheless, that any failure to comply with its newly prescribed refund regulations would consti-

tute an unfair or deceptive act or practice in connection with the sale or promotion of a course. *Id.* § 438.0.

These regulations, the Commission says, are designed "to alter the incentive structure for obtaining vocational school enrollments." 43 Fed.Reg. at 60809. Elaborating on this subject in its brief, the Commission states that the schools "make little effort to screen candidates to determine if they possess the required verbal, reading or mechanical skills necessary for the courses of study" and that they sign up "unsuitable enrollees". The rationale of the Rule is said to be the "[creation of] structural disincentives to indiscriminate enrollment", which, translated into less dainty language, means "the creation of structural incentives for discriminate enrollment."

The Commission argues that this foray into the field of education is a "reasoned exercise of its legislative judgment" in an area "plainly within its expertise, *i. e.,* unfair selling practices." [4] Commission counsel describe this as an exercise of the Commission's "broad remedial discretion", subject to as little judicial review under the Magnuson-Moss Act as had been exercised prior thereto. We disagree.

When Congress provided that the Commission's rules must define unfair and deceptive acts with specificity, it clearly intended that the Commission's definition would be subject to judicial review. *See* S.Rep.No.93–1408, 93d Cong., 2d Sess. (1974), *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 7702, 7755, 7766–67. And when Congress, after being informed that the Commission was "strongly opposed" to the substantial evidence standard of review,[5] nonetheless incorporated that stan-

---

4. Statements in the Commission's brief that its decision is "to apply the Rule at this time only to the predominant category of proprietary schools, but not the smaller category of public or non-profit schools" and that it is dealing with "the most pressing problems first," indicate that the Commission may not intend to limit the exercise of its claimed expertise to the proprietary education sector.

At the present time, however, in response to petitioners' contentions that they are being de-

nied equal protection of the laws, the Commission distinguishes the policies and practices of the public, nonprofit schools from those of the proprietary schools.

5. *See* Letter from Commission to Chairman of House Committee on Interstate and Foreign Commerce, *reprinted in* [1974] U.S.Code Cong. & Ad.News, pp. 7702, 7735–40.

dard in the statute, see section 57a(e)(3)(A), it obviously intended that a Commission rule not receive judicial approval "unless the Commission's action was supported by substantial evidence in the record taken as a whole." H.R.Rep.No.93–1107, 93d Cong., 2d Sess. (1974), reprinted in [1974] U.S.Code Cong. & Ad.News, pp. 7702, 7729.

■ Although courts normally give weight to an agency's interpretation of its own enabling legislation, the judiciary is the final authority on issues of statutory construction. Volkswagenwerk Aktiengesellschaft v. FMC, 390 U.S. 261, 272, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968). An agency interpretation must be granted deference only when it is consistent with the congressional purpose, Morton v. Ruiz, 415 U.S. 199, 237, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974), and when there are no "compelling indications that it is wrong." Espinoza v. Farah Manufacturing Co., 414 U.S. 86, 94–95, 94 S.Ct. 334, 339, 38 L.Ed.2d 287 (1973) (quoting Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969)).

■ Assuming, without deciding, that the Commission has the power to alter the schools' incentive structure for engaging in high pressure or deceptive sales and enrollment practices, its Rule was clearly not so limited in its scope. The Rule penalizes every vocational school for every student dropout, regardless of cause.

This Court is obligated to take a close look at what the Commission has done and to determine whether it has articulated a "rational connection between the facts found and the choice made." Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962); Office of Communication of United Church of Christ v. FCC, 560 F.2d 529, 532 (2d Cir. 1977); Home Box Office, Inc. v. FCC, 567 F.2d 9, 35, 185 U.S.App.D.C. 142, 168 (D.C.Cir. 1977), cert. denied, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977). We have taken a close look, and we find no rational connection between the Commission's universally applicable refund requirements and the prevention of specifically described unfair and deceptive enrollment practices.

## II

## THE DISCLOSURE PROVISIONS

The Commission's Rule contains a number of provisions dealing with job-placement statistics and graduation rates. See 16 C.F.R. § 438.3. These provisions require the making of certain disclosures and prohibit the making of other factually correct disclosures. Again, no unfair or deceptive acts or practices are defined with specificity, except as a violation of the disclosure requirements may be said to be such. Although, unlike the provisions for refunds, the disclosure provisions may properly be said to fall within the field of advertising, sales, and enrollment, petitioners contend that they too are invalid.

### 1. Job-Placement Statistics

Under the Commission's Rule, each student is given a fourteen day "cooling-off" period during which he may cancel his enrollment without any financial obligation to the school. After the school has accepted the student's enrollment contract it must mail to the student a notice aptly entitled "HOW TO CANCEL YOUR CONTRACT". If the school has made any prior reference to the availability of jobs or the ability of its graduates to find jobs, it must also enclose in the same envelope a form entitled "How Our Students Are Doing." The information contained in this form must be based on the school's "actual knowledge" of its graduates' job experience, 16 C.F.R. § 438.3(c), which must be stated in the following manner:

"Since we made job placement or earnings claims in promoting this course, we have prepared our record in these areas for your review. As the Graduation Record pointed out, 50 students graduated from this course from _____ to _____. We found that 38 or 76% of these 50 graduates got jobs in the field of _____ within 4 months of their graduation." 16 C.F.R. § 438, Appendices A–C.

The form must then show the number of students and the "percent of total" in each of several salary brackets.

No other job-placement information may be contained in the same envelope. The school may not show how many students could not be contacted or did not respond to its job placement inquiries. It may not disclose how many of them did not seek jobs within four months after graduation because of marriage, pregnancy, prior employment, self-employment, continued schooling, or other reasons. Proof in the record shows that adherence to the Commission's Rule would require one school to show a job placement rate of 5.8%, when in fact the true employment success rate of those who responded to the school's inquiry was 54%, or 80%, if those who became self-employed were included. Another school would have to show a placement figure of approximately 67%, although almost 100% of its graduates who sought employment obtained it. Nonetheless, each school must content itself with the anemic caveat quoted in the margin [6] and the privilege of sending additional information in other mailings.

■■ Obviously, statements so factually distorted do not disclose the schools' "record" in the area of job placement and earnings. It is unfair to both the school and the misguided student to require the school to say so without adequate explanatory comment. The failure to disclose material information may cause an advertisement to be false or deceptive even though it does not state false facts. *Simeon Management Corp. v. FTC*, 579 F.2d 1137, 1145 (9th Cir. 1978). Commission rules should be designed to eliminate deception, not to foster it by requiring the dissemination of a deceptively incomplete "record". *See Friedman v. Rogers*, 440 U.S. 1, 19–26, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979) (Blackmun, *J.,* concurring in part and dissenting in part). Because the Commission is attempting to exercise a power "inconsistent and at variance with the over-all purpose and design of the Act," *Heater v. FTC*, 503 F.2d 321, 323 (9th

Cir. 1974); *see* § 5 U.S.C. § 706(2)(C); *Papercraft Corp. v. FTC*, 472 F.2d 927, 933 (7th Cir. 1973), or, alternatively, is exercising its assigned authority in an arbitrary and capricious manner, 5 U.S.C. § 706(2)(A); *see National Nutritional Foods Ass'n. v. Mathews*, 557 F.2d 325, 338 (2d Cir. 1977), that portion of its Rule dealing with job-placement disclosure cannot stand.

### 2. Graduation Statistics

■ On the disclosure form entitled "How Our Students Are Doing," the schools are also required to show the number and percentage of enrollees in past classes who graduated. 16 C.F.R. § 438.3(a). The schools are prohibited from enclosing any additional information with this communication. For example, they may not state why dropouts occurred, nor may they give comparative dropout statistics for the public schools. 16 C.F.R. § 438.3(e). They are permitted, however, to make the following statement:

"In evaluating these figures, you should know that students may drop out of a course for a variety of reasons. These range from dissatisfaction with the course to inability to do the work. Other students drop out of school for personal reasons." 16 C.F.R. § 438.3(a)(5).

The Commission did not find as a factual basis for this regulation that all, or even a substantial portion, of the schools misrepresented their graduation rates. 43 Fed.Reg. at 60805. On the contrary, it found that most schools do not disclose them. *Id.* However, the Commission found that the disclosure of graduation rate information is essential for a proper evaluation of claims concerning placement success. *Id.* It concluded that, on one occasion, this disclosure should be made without being buried in a mass of accompanying material.

---

**6.** 16 C.F.R. § 438.3(b)(4) provides:

A school may, at its option, include the following statement on the Disclosure Form in the manner shown in Appendices A–C:

In evaluating our record, remember not all of our students took this course to get a job in the field of [*school to insert area of training*]. Also, we were unable to reach some of our graduates to see if they got jobs. So, our placement percentage *might be understated.*

Giving deference to the Commission's reasoning, we find this to be a proper requirement for preventing unfair and deceptive practices. There is a valid distinction between this requirement and the job-placement regulations that we have heretofore found to be invalid. Dropout figures are in the school's possession and can be accurately stated. Petitioners do not argue that the Commission cannot require this to be done, but contend instead that the Commission's ban against the inclusion of additional dropout information violates their First Amendment rights as enunciated in *Linmark Associates, Inc. v. Township of Willingboro*, 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977). This is a strong argument that cannot be lightly brushed aside. *See Cotherman v. FTC*, 417 F.2d 587, 596 (5th Cir. 1969); *Ultra-Violet Products, Inc. v. FTC*, 143 F.2d 814, 816–17 (9th Cir. 1944); *FTC v. Civil Service Training Bureau, Inc.*, 79 F.2d 113, 115 (6th Cir. 1935).

The Supreme Court has held, however, that commercial speech "[is] less likely than other forms of speech to be inhibited by proper regulation," *Friedman v. Rogers, supra*, 440 U.S. at 10, 99 S.Ct. at 894 and "regulatory commissions may prohibit businessmen from making statements which, though literally true, are potentially deceptive." *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 68, 96 S.Ct. 2440, 2451, 49 L.Ed.2d 310 (1976); *see id.* at 68 n.31, 96 S.Ct. 2440. We believe that when the Commission prescribed its requirements for preventing unfair or deceptive acts or practices, the First Amendment permitted it reasonable latitude to avoid the emasculation of its preventive requirements that might result from their being buried in a mass of other material. We conclude that the Commission's modest, one-time ban on the furnishing of diluting factual information is reasonable and does not violate petitioners' First Amendment rights.

## III

## COOLING–OFF AND CONSTRUCTIVE CANCELLATION PROVISIONS

■ Petitioners' challenge to the cooling-off and constructive cancellation provisions of the Rule requires little discussion. The former permit a student to cancel his enrollment contract without any financial obligation within fourteen days after receipt of his "HOW TO CANCEL YOUR CONTRACT" form. 16 C.F.R. § 438.2(d). The latter provide that a student shall be deemed to have given constructive notice of his intention to withdraw if he fails to attend classes or submit lessons for prescribed periods. 16 C.F.R. § 438.1(n).

Petitioners do not challenge the concept of a cooling-off period, designed, as it is, to give the student breathing space in which to recognize and react to deceptive and unfair sales practices. Such cooling-off provisions are common in state school regulations and have been prescribed by the Commission itself in connection with ordinary door-to-door sales. *See* 16 C.F.R. § 429.1. Petitioners would prefer a reaffirmation procedure by which an enrollment contract would be automatically cancelled unless a student reaffirmed. Residential schools also urge that class attendance be considered a waiver of the cooling-off period. These were matters appropriately argued before and decided by the Commission.

The same is true of the provisions for constructive cancellation. The Presiding Officer found ample evidence of the propensity of some schools to create technical and procedural requirements that must be met before the school is required to make a refund, and stated that "[i]t was this kind of chicanery which involved us in this proceeding in the first place . . . ." The Commission's requirements were reasonably aimed at eliminating this abuse.

## IV

## THE PREEMPTION PROVISIONS

The preemption provisions of the Rule read in part as follows:

"This trade regulation rule preempts any provision of any state law, rule, or regulation which is inconsistent with or otherwise frustrates the purpose of the provi-

sions of this trade regulation rule, except where the Commission has exempted such a state or local law, rule or regulation. If, upon application of any appropriate state or local governmental agency, the Commission determines that the state statutory or regulatory provision affords greater protection to students than the comparable provision of the Commission's rule then the state requirement will be applicable to the extent specified in the Commission's determination on the exemption application." 16 C.F.R. § 438.9.

This provision highlights the failure of the Commission to define with specificity the acts or practices which are unfair or deceptive. The purpose of the Rule is stated in general terms to be the alleviation of abusive practices against vocational and home-study school students and prospective students. In the absence of a specification of the acts or practices which the Commission deems deceptive, the breadth of the preemption provision is such that it places in issue an indefinite variety of state laws and regulations governing the contractual relations between vocational schools and their students.

 It has long since been firmly established that state statutes and regulations may be superseded by validly enacted regulations of federal agencies such as the FTC. *See, e. g., Free v. Bland,* 369 U.S. 663, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962); *Spiegel, Inc. v. FTC,* 540 F.2d 287, 293 (7th Cir. 1976); *Royal Oil Corp. v. FTC,* 262 F.2d 741, 743 (4th Cir. 1959); *Chamber of Commerce v. FTC,* 13 F.2d 673, 684 (8th Cir. 1926). However, before preemption shall be deemed to have occurred, there must be either a clear manifestation of such congressional intent or a conflicting inconsistency between state and federal regulations. *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963); *California v. Zook,* 336 U.S. 725, 733, 69 S.Ct. 841, 93 L.Ed. 1005 (1949). This is particularly true where the field of regulation is one that has been traditionally occupied by the states. *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977).

In enacting the Magnuson-Moss Act, Congress did not intend that the Commission's regulations should "occupy the field" so as to preclude any state regulation whatever. The Magnuson-Moss Act contains no preemption provisions. Such indications of congressional intent as may be gleaned from the legislative history of the 1975 enactment and the predecessor bills considered by Congress [7] show that the Commission's regulations were to have no more preemptive effect than that which flows inevitably from a repugnancy between the Commission's valid enactments and state regulations. If the Commission had defined with specificity the acts or practices it deemed unfair‧ or deceptive, questions of preemption could be answered with relatively little difficulty. An entirely different picture is presented when the Commission assumes the authority to decree preemption of any state law or regulation which "frustrates the purpose" of its Rule's inadequately spelled out provisions. One may well wonder, for example, what state regulations might be said to frustrate the purpose of the refund provisions, designed as they are to create structural disincentives to indiscriminate enrollment. The fact that the Rule permits state governmental agencies to come before the Commission seeking grace from preemption does not solve the problem of overbreadth.

 Where an explicitly formulated federal statute or regulation is in conflict with state law, preemption of state law follows inevitably from the supremacy clause of the Constitution. Article VI, Clause 2; *Free v. Bland, supra,* 369 U.S. at 666–68, 82 S.Ct. 1089. There is no need for the Commission to so state. The preemption provisions of the Commission's Rule go beyond this. They are overboard, and their enactment was beyond the Commission's power.

---

7. For a discussion of the legislative history, *see* P. Verkuil, *Preemption of State Law by the Federal Trade Commission,* 1976 Duke L.J. 225, 234–40.

■ We find no merit in the Commission's contention that the asserted illegality of the preemption provisions is not an issue ripe for review. The preemption provisions are in final form, and they have the force of law. Congress provided that not later than sixty days after a rule is promulgated any interested person may file a petition in the circuit court for judicial review of the rule. 15 U.S.C. § 57a(e)(1)(A). A "rule" under the Administrative Procedure Act includes "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . ." 5 U.S.C. § 551(4).

This Court is given jurisdiction to review the Rule in accordance with chapter 7 of Title 5 and should hold it unlawful if it is not in accordance with . law, 5 U.S.C. § 706(2)(A), or is in excess of statutory jurisdiction or authority, 5 U.S.C. § 706(2)(C). These broadly remedial provisions should not be construed in such a manner as to deprive petitioners of their right of review "in the absence of clear and convincing evidence that Congress so intended." *Rusk v. Cort*, 369 U.S. 367, 379–80, 82 S.Ct. 787, 794, 7 L.Ed.2d 809 (1962).

The question presented by petitioners' challenge is purely a legal one, *i. e.,* whether the Commission has been given the power to declare a blanket preemption of any state law, rule, or regulation that "frustrates the purpose" of its Rule. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Gardner v. Toilet Goods Association, Inc.,* 387 U.S. 167, 170, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967); *Columbia Broadcasting System Inc. v. United States*, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942).

Petitioners are "interested persons" within the meaning of section 57a(e)(1)(A). They have an immediate and pressing need to know whether the Commission has validly preempted all state laws, rules, and regulations that "frustrate the purpose" of the Rule because their conduct in each of the fifty states must be governed accordingly. This need to conform, based on the desire to avoid unpleasant legal consequences, causes a serious and immediate impact justifying prompt review. *Abbott Laboratories v. Gardner, supra,* 387 U.S. at 152–54, 87 S.Ct. 1507; *Columbia Broadcasting System, Inc. v. United States, supra,* 316 U.S. at 418–25, 62 S.Ct. 1194.

Petitioners are already before this Court seeking review of other portions of the Rule. Enforcement of the Rule will not be further delayed by a thorough review of its provisions. Indeed, if petitioners are correct in their contentions as to the overbreadth of the preemption provisions, the efficient operation of the administrative process will be furthered by the disposition we now make.

## V

### COSMETOLOGY SCHOOLS

Of the 7,000 schools affected by the Commission's Rule, over 2,400 are schools of cosmetology. These are predominantly small, the majority of them having annual gross receipts of less than $100,000. They are licensed in all fifty states by cosmetology boards or similar regulatory agencies, which also license graduates and prescribe training requirements. The primary goal of cosmetology students is to secure a license, not necessarily a full-time job. Many graduates seek only part-time work, go into business for themselves, or leave or reenter the practice of their profession as their needs dictate.

Petitioner, National Association of Cosmetology Schools, asserts that there was little if any evidence introduced showing that cosmetology schools were guilty of the abuses that concern the Commission, and argues that those schools should have been completely exempted from the requirements of the Rule. The Commission does not seriously dispute petitioner's assertion, but answers petitioner's argument by pointing to the provisions of section 57a(g)(1), which permit the cosmetology schools to petition the Commission for exemption. The Commission cites a long line of cases in support of its contention that "an agency may adopt a rule shown to be appropriate for the generality of instances and leave the

correction of injustices to applications by those concerned . . ..." *National Nutritional Foods Ass'n v. FDA*, 504 F.2d 761, 784 (2d Cir. 1974), *cert. denied*, 420 U.S. 946, 95 S.Ct. 1326, 93 L.Ed.2d 424 (1975); *see United States v. Allegheny-Ludlum Steel Corp.*, 406 U.S. 742, 749, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972); *Permian Basin Area Rate Cases*, 390 U.S. 747, 769, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968).

Because cosmetology schools and flight training schools, which are subject to regulation and licensing by the Federal Aviation Agency, together comprise about 5,000 of the 7,000 schools covered by the Rule, a reasonable argument may be made that the subject matter of the Commission's Rule is not applicable to the generality of the industry. The Presiding Officer recommended, for example, that the Commission should give careful consideration to granting exemptions to these two classes of schools. *See* Presiding Officer's Report 10–11.

In view of the escape clause provided these schools by the exemption provisions of section 57a(g)(1), the better procedure may be to follow the Presiding Officer's recommendation. If the cosmetology and flight training schools apply for exemption, they will be able to focus the Commission's attention upon their peculiar characteristics and practices which, they contend, entitle them to exemption, and a better and more complete record will be presented for judicial review. We cannot say that the Commission erred in deciding to follow that route.[8]

## VI

### DEFINITION OF "COURSE"

The term "course" is defined in the Rule as a program which "purports to prepare or qualify individuals, or improve or upgrade the skills individuals need, for employment in any specific occupation, trade, or in job positions requiring mechanical, technical, business, trade, artistic, supervisory, clerical or other skills" but does not include "general self-improvement courses which do not purport to offer training necessary to obtain employment in a specific skill or trade." 16 C.F.R. § 438.1(c)(1), (2).

Petitioner, Control Data Corporation, has developed a new system of computerized instruction which utilizes programmed material and individualized interaction, including instruction and testing, between the student and the computer. The courses vary in length between two and sixty-four hours, and each student may pursue the course at his own pace. At the present time, over 750 courses are offered in 27 different areas. Only a few, however, are intended as preparation for entry-level employment.

Control Data contends that all of the proceedings before the Commission were in the context of protecting students who were preparing for entry-level employment and that, because the Rule includes courses designed to improve and upgrade skills, it goes beyond the scope of the Commission's inquiry and is therefore unsupported by substantial evidence. This, we think, is an unjustifiably narrow view of the record. General Issue No. 2, as designated by the Presiding Officer, was "for what purposes do students enroll in vocational and home-study schools?" *See* Presiding Officer's Report at 23. The Presiding Officer found that "if the student is already employed, he wants to prepare himself for a more prestigious position with better pay, perhaps in

8. The cosmetology schools have already requested an exemption, and the Commission has commenced a proceeding pursuant to 5 U.S.C. § 553 to determine whether the exemption should be granted. In the Commission's Invitation to Comment, 44 Fed.Reg. 40929–32 (July 13, 1979), the Commission stated that, based on the evidence then before it, it was "unable to make the finding required for an exemption at this time." *Id.* at 40929. Is also stated that the absence of any evidence that cosmetology schools have engaged in the practices that the Rule is designed to prevent "cannot be dispositive in determining whether an exemption from the Rule is appropriate." *Id.* at 40931. In accepting the Commission's argument that the exemption provisions furnish adequate protection for the cosmetology schools, we do not necessarily adopt the Commission's above-quoted interpretation of those provisions.

an 'up-and-coming field', or to acquire additional skills or knowledge that will improve his present working capability and/or prepare himself for pay increases, promotions and re-designations into higher-paying positions, or advancement into supervisory positions." *Id.* at 24–25 (footnote citations to record omitted). Although the thrust of the Commission's inquiry was in the area of preparation for entry-level employment, its overall review clearly was not so limited.

Control Data asserts, nonetheless, that the Commission's definition is so broad as to include most of the courses it teaches, including such courses as "Beginning Typing", "Trouble-shooting Fuel Systems", and "Identification of Grinding Wheels". It argues quite reasonably that the furnishing of graduation rates for two-hour courses[9] and job-placement rates for courses such as "Beginning Typing" can hardly be what Congress had in mind when it authorized the Commission to prescribe requirements for the purpose of preventing unfair acts or practices.

Because we cannot predict what form the Commission's revision of its present Rule will take, we will not approve or disapprove the existing definition. It is to be hoped, however, that the Commission will recognize the legitimate merits of complaints such as those of Control Data and will make appropriate modifications in either its requirements, its definition, or both, so as to relieve those schools of expenditures not reasonably related to or required for the prevention of unfair acts and practices.

## VII

### PETITIONERS' REMAINING CONTENTIONS

■ Petitioners' complaints of *ex parte* communications between the Commission

and an allegedly biased staff do not disclose a lack of due process and are more properly addressed to Congress. *See Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council, Inc.*, 435 U.S. 519, 539–49, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); *Hoffman-LaRoche, Inc. v. Kleindienst*, 478 F.2d 1, 12–13 (3d Cir. 1973).

■ The alleged inadequacy of the Commission's Statement of Basis and Purpose is not subject to judicial review by this Court. *See* 15 U.S.C. § 57a(e)(5)(C).

## CONCLUSION

For the reasons above stated, we conclude that the Rule, as presently formulated, is unlawful and must be set aside. The matter is remanded to the Commission for further proceedings not inconsistent with this opinion. *See NLRB v. Food Store Employees Union*, 417 U.S. 1, 9–11, 94 S.Ct. 2074, 40 L.Ed.2d 612 (1974).

NEWMAN, Circuit Judge, dissenting:

This is the first case to decide the lawfulness of a rule promulgated by the Federal Trade Commission under its newly confirmed authority to use the rulemaking power to protect American consumers from unfair and deceptive trade practices. In 1975 Congress settled the long-standing question of whether the Federal Trade Commission has substantive rule-making authority by enacting § 202(a) of the Magnuson-Moss Warranty—Federal Trade Commission Improvement Act, Pub.L.No. 93–637, 88 Stat. 2183, 2193, *codified at* 15 U.S.C. § 57a (1976). This legislation made explicit the Commission's substantive rulemaking authority with respect to unfair or deceptive acts or practices. *Cf. National Petroleum Refiners Ass'n v. Federal Trade*

---

**9.** The Rule excludes from its application any course whose total contract price is less than one hundred dollars "provided that the student has not enrolled in any other course with that school during the calendar year and that the school does not offer any other 'course' as defined by this paragraph, for one hundred dollars ($100) or more." 16 C.F.R. § 438.-1(c)(4).

This exclusion is so limited in scope as to have little practical effect. The Commission's suggestion that any school may petition for the exemption of any of its courses under section 57a(g) is equally impractical in view of the statutory requirement that rulemaking procedure must be followed on each petition for exemption. *See* 5 U.S.C. § 553.

*Commission,* 157 U.S.App.D.C. 83, 482 F.2d 672 (D.C.Cir.1973), *cert. denied,* 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974) (upholding FTC authority to promulgate substantive rules under § 6(g) of the Federal Trade Commission Act, 15 U.S.C. § 46(g) (1976)). The Court invalidates the Rule for Proprietary Vocational and Home Study Schools, 16 C.F.R. part 438 (1979), concluding that the Rule violates procedural and substantive requirements of Magnuson-Moss in four respects. These concern the definition of deceptive practices, the pro rata refund remedy, the job-placement disclosure remedy, and the preemption provision. The Court also concludes that the Rule survives all the other challenges mounted by the petitioners. Believing that the Rule is in all respects a lawful response to documented unfair and deceptive practices found by the Commission to exist in the proprietary vocational school field, I dissent.

### 1. *Definition of Deceptive Practices*

The majority concludes that the Rule is procedurally defective for failure to define unfair or deceptive acts or practices as required by 15 U.S.C. § 57a(a)(1)(B) (1976). This provision authorizes the Commission to prescribe

> (B) rules which define with specificity acts or practices which are unfair or deceptive acts or practices in affecting commerce (within the meaning of section 45(a)(1) of this title). Rules under this subparagraph may include requirements prescribed for the purpose of preventing such acts or practices.

The structure of the Vocational School Rule is undisputed: the Rule imposes upon the schools several affirmative requirements and defines as a deceptive practice a school's failure to observe each of these requirements. The majority believes that Congress expected more from the Commission than the definition of a deceptive practice in terms of a failure to comply with affirmative requirements. Apparently the majority believes the Rule is procedurally defective because the Commission did not first define each deceptive practice and then follow with a separately stated affirmative requirement to remedy each practice. In the circumstances of this case, I find the Rule entirely lawful as a matter of procedure. My conclusion is based on a consideration of the statute and the Commission's rule-making experience that informed Congressional enactment of the statute.

The statute contemplates a two-step approach: the mandatory definition of an unfair or deceptive practice and the permitted remedying of it. But the terms of the statute do not require that the definition and the remedy always be independently stated. Such a requirement would be an empty formalism in the many situations where the definitional and remedial aspects of a deceptive practice coincide. An obvious example occurs whenever the Commission determines that consumers in a particular field are being misled because certain data is not disclosed to them. In such situations, the deceptive practice is the failure to disclose the pertinent data, and the obvious remedy is a requirement that the data be disclosed. The definition of the deceptive practice and the remedy for it are opposite sides of the same coin. When this happens, the statute should not be read to prevent the Commission from defining as a deceptive practice the failure to observe the required remedy. No purpose would be served by insisting that the Commission first define as a deceptive practice the failure to disclose the pertinent data and then specify as a remedy the obligation to disclose the data.[1]

However, some remedies are adopted not because their absence is itself unfair or deceptive but only because they are an appropriate response to some unfair or deceptive practice that is occurring in the pertinent industry. The failure to observe that sort of remedy is not what the statute permits the Commission to condemn as an

---

1. The same analysis applies to Commission remedies that prohibit specified conduct. The Commission need not separately define as a deceptive practice conduct such as the making of a particular misleading claim and also specify as a remedy that the claim may not be made.

unfair or deceptive practice, and the Commission therefore cannot adopt a rule that calls such a failure an unfair or deceptive practice. In those situations where the failure to comply with a remedy is not itself unfair or deceptive, the statute requires that the unfair or deceptive practice be defined independently of the remedy.[2]

This analysis of the statute, permitting a deceptive practice to be defined in terms of a failure to observe a required remedy, but only when the failure itself is properly found to be unfair or deceptive, draws support from the legislative history of Magnuson-Moss. This history indicates that the wording of § 57a(a)(1)(B) was designed to give the Commission flexibility, not to create two independent requirements. The provisions for FTC rule-making in the House of Representatives version of the bill, which substantially became the enacted version, simply authorized the definition of unfair or deceptive practices, without specifically authorizing remedies. H.R. 7917, 93d Cong., 2d Sess. § 202(a), 120 Cong.Rec. 31743 (1974). The Conference report makes clear that the second sentence of § 57a(a)(1)(B) was added "for the purpose of clarifying what was perhaps a technical deficiency in the House rule-making provision." S.Rep.No.93–1408, 93d Cong., 2d Sess. 31 (1974), *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 7702, 7755, 7763. Thus, in drafting its version of Magnuson-Moss, the House apparently believed that the first sentence of § 57a(a)(1)(B) already included authority to prescribe remedies. It is ironic that the conferees' decision to add language confirming the Commission's broad authority should become a basis for

invalidating the way in which the Commission has exercised that authority.

Furthermore, Congress did not require a specific definition of unfair or deceptive practices in order to prevent the Commission from defining them in terms of required remedies. Congress required specific definitions of such practices so that a rule would "reasonably and fairly inform those within its ambit of the obligation to be met and the activity to be avoided." H.R.Rep. No.93–1107, 93d Cong., 2d Sess. 46 (1974), *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 7702, 7727. There can be no doubt that the provisions of the Vocational School Rule are extremely specific in informing the schools of "the obligation to be met." Indeed, the schools complain that several requirements are too precise.

The Commission's experience with trade regulation rules under its general rule-making authority as exercised prior to Magnuson-Moss further supports the Commission's approach to the structural requirements of its rule-making authority. When the Commission began issuing trade regulation rules in 1962, it initially attacked specific deceptive practices that could be precisely defined in terms of what was occurring in the market place. The use of "cut size" dimensions unaccompanied by dimensions of the finished product was found misleading as to sleeping bags and tablecloths. 16 C.F.R. parts 400, 404 (1979). The designation "automatic" was found misleading as to sewing machines. 16 C.F.R. part 401 (1979). The designation "leakproof" was found misleading as to batteries. 16 C.F.R. part 403 (1979). In each case, the remedy

---

**2.** The majority contends that support for its view that a deceptive practice must always be defined independently of a remedy is found in the Act's provision concerning the content of a statement of basis and purpose. That statement is required to describe "the prevalence of the acts or practices treated by the rule." 15 U.S.C. § 57a(d)(1)(A). In the majority's view, a failure to observe a newly imposed requirement could not itself be a defined deceptive practice because it was not previously "prevalent." In my view, the Commission adequately documents the prevalence of a deceptive practice when its record demonstrates the widespread

existence of circumstances under which failure to make a disclosure is deceptive to consumers. What is prevalent is the absence of certain data, under circumstances where the data is needed to avoid deception. In other contexts, what are prevalent are the various false and misleading claims, not defined in a rule, but described in a statement of basis and purpose, and remedied by the affirmative requirements imposed by a rule. Perhaps that is why § 57a(d)(1)(A) refers to the prevalence of practices "treated" by a rule, rather than defined by a rule.

that the Commission codified in a rule was a simple prohibition of the use of the misleading term. As the Commission moved on to areas of trade where the nature of the deception was more complex, it soon found that simple prohibition of the practices occurring in the market place was not always possible. A variety of deceptive techniques could be generally described, but precision was achieved only by establishing rules that imposed affirmative requirements.

These rules were of two basic types. The first type combatted misleading statements by defining as a deceptive practice the failure to use specified designations. See, e. g., the rule on leather content of belts. 16 C.F.R. part 405 (1979). In these cases the Commission began to include in a rule only the remedy (always defining the deceptive practice as a failure to comply with the remedy) and to place in a statement of basis and purpose a description of the prevalent practices that occasioned the rule. See, e. g., rule on glass fiber fabrics, 16 C.F.R. part 413 (1979); rule on radio transistors, 16 C.F.R. part 414 (1979); rule on extension ladders, 16 C.F.R. part 418 (1979).

The Octane Rule, upheld in *National Petroleum Refiners Ass'n v. Federal Trade Commission, supra,* was a classic example of this first type of rule, combining substantive and remedial aspects of a deceptive practice into a single structure. The Rule specified that octane ratings must be displayed at gas station pumps, and it defined as a deceptive practice the failure to do so. 36 Fed.Reg. 23871 (1971), *reprinted in National Petroleum Refiners Ass'n, supra,* 157 U.S.App.D.C. at 85, n.1, 482 F.2d at 674, n.1. A description of the misleading situation confronting consumers who purchase gasoline either in the absence of octane ratings or in the presence of misleading octane claims was detailed in a Statement of Base [*sic*] and Purpose. 36 Fed.Reg. at 23871.

A second type of rule promulgated by the Commission in the pre-Magnuson-Moss era combatted misleading statements by identifying as an unfair practice the failure to provide consumers with a means of avoiding the consequence of the deception. The most notable example was the rule on door-to-door sales. 16 C.F.R. part 429 (1979). That rule required those who make any door-to-door sales to permit purchasers to cancel their purchases within a "cooling-off" period of three business days and required that each purchaser receive a notice informing him of his cancellation rights. The rule defined failure to give the required notice of the "cooling-off" period and the cancellation rights as a deceptive practice.

The legislative history of Magnuson-Moss makes clear that Congress was fully aware of the evolution of the Commission's approach to trade regulation rules, see H.R. Rep.No.93–1107, *supra,* at 32–33, [1974] U.S. Code Cong. & Admin.News, p. 7715, and gives no indication that Congress wished to change the Commission's approach of defining a deceptive practice in terms of a failure to observe an affirmative requirement. The Octane Rule was specifically noted in the House Report. *Id.* at 33, [1974] U.S. Code Cong. & Admin.News, at p. 7715. The Conference Report went further: it cited the Octane Rule as an example of the authority the Commission was to continue to exercise under Magnuson-Moss. S.Rep.No. 93–1408, *supra,* at 31, [1974] U.S.Code Cong. & Admin.News, p. 7764.

In enacting Magnuson-Moss, Congress sought to confirm the Commission's authority to use rule-making to combat deceptive trade practices. There is no basis for concluding that it sought to alter the structural requirements of the rules themselves. To protect those subject to Commission rule-making from unfair or arbitrary actions by the Commission, Congress expanded the hearing rights of affected businesses during the course of the rule-making proceedings. 15 U.S.C. § 57a(b), (c). In addition, Congress required that the Commission's rule must be supported by substantial evidence, and provided that a reviewing court could overturn any rule that was not so supported. *Id.* § 57a(e)(3)(A). Congress preferred such real procedural protections to the artificial protection, imposed by the majority, which requires the Commission to engage in formalistic verbal recitations.

Analysis of the Vocational School Rule demonstrates why it fully satisfies the definitional requirement of § 57a(a)(1)(B). Essentially the Rule imposes four affirmative requirements, and defines as an unfair or deceptive practice the failure to comply with each of them. The four requirements are: (1) schools must disclose the number and percentage of enrolled students in each course who graduated; (2) schools that make express claims concerning availability of jobs or earnings to be achieved must disclose the number, percentage, and salary ranges of recent graduates known to have found jobs; (3) schools must afford students a fourteen-day "cooling-off" period in which enrollment contracts may be cancelled and must inform students of their cancellation rights and how to exercise them; (4) schools must refund to any student who withdraws before completing a course a part of the tuition proportional to the unfinished part of the course.

Initially, it may be observed that the rule literally complies with § 57a(a)(1)(B). The Rule does define several unfair or deceptive practices and does so with specificity. While the Rule defines these practices in terms of the required remedy, that approach, for all the reasons previously stated, is valid since as to each provision of the Rule, the definitional and remedial aspects of each deceptive practice coincide. The first two provisions fit the previously mentioned pattern represented by the Octane Rule. The Commission has found that the absence of graduation and job-placement data is seriously misleading to potential students in at least two respects. First, it denies students information needed to make an informed choice as to whether and where to spend their money for vocational education. Second, it leaves unrebutted the misleading claims that some schools are making concerning their graduation and job-placement rates. The Commission has fully explained these considerations in its Statement of Basis and Purpose (SBP) accompanying the Rule. 43 Fed.Reg. 60796, 60805–08 (1978). Having found that the absence of graduation and job-placement data is substantively misleading, the Commission took the obvious remedial step of requiring their disclosure. The Rule coalesces these substantive and remedial aspects by defining as a deceptive practice the failure to disclose the graduation and job-placement data. No useful purpose would be served, certainly none required by Congress, by forcing the Commission to put in one provision of the Rule a definition that failure to disclose the data is a deceptive practice and in another provision of the Rule a remedy that requires disclosure of the data.

The cancellation and refund provisions of the Rule are subject to similar analysis. The Commission found that many schools are making false and misleading claims not only concerning graduation rates and job-placement success but also concerning a student's experience while attending classes. The SBP notes the prevalence of "exaggerated or false statements concerning a school's equipment and facilities," "the quality of instruction provided," and "the availability of part-time employment opportunities during the course." SBP § B(3)(b)(1), 43 Fed.Reg. at 60799. The Commission concluded that it is unfair not to afford students an opportunity to escape the financial consequences of the deceptions to which they had been subjected. Having surveyed existing cancellation and refund practices, the Commission found that though these practices were not themselves unfair or deceptive, SBP § C(6)(a), 43 Fed. Reg. at 60809, such practices resulted "in large financial losses and attendant harsh consequences for students." SBP § B(6)(c), Fed.Reg. at 60801. The Commission therefore specified that it is unfair not to permit students to cancel their contracts entirely after a "cooling-off" period and also unfair not to permit them to cancel their contracts partially during a course and receive a pro rata refund. Following the structure of the door-to-door sales rule, the Commission defined as an unfair practice the failure to observe the Commission's cancellation and refund requirements. Again, as a matter of procedure, there is no point in demanding that the Commission first define as an unfair practice the failure to afford these

cancellation and refund opportunities and then include in the Rule a second provision requiring these opportunities.

While the refund provision can be satisfactorily analyzed as another instance where the definitional and remedial aspects of an unfair or deceptive practice coincide, the Commission has invited further procedural objection to the refund provision by acknowledging that the refund provision is essentially remedial,[3] thereby recognizing that the unfair practice which it remedies is not simply the failure to observe the mandated refund requirement.[4] In the Commission's view the refund provision is a remedy for various unfair or deceptive practices, some of which are defined in the Rule and some of which are described in the SBP. For example, the Commission cites as a deceptive practice remedied by the refund provision a school's failure to disclose job-placement and earnings data. SBP § C(6)(a), 43 Fed.Reg. at 60809. The difficulty with that analysis is that the misleading nature of job-placement claims will not become apparent to many students until after graduation, when a refund provision will not be an effective remedy. To the extent that the refund provision is a remedy, it primarily remedies deceptive practices likely to be discovered by students while still in school, such as false or misleading claims concerning the school itself. While such deceptive claims are fully described in the SBP, a further question arises whether the Commission can adopt a refund provision to remedy deceptive practices that are

described in the SBP, instead of defined in the Rule itself.

There is no doubt that § 57a(a)(1)(B) authorizes the Commission to include in a rule requirements "prescribed for the purpose of preventing such acts or practices," referring to acts or practices defined in the rule itself. But it should not be hastily concluded that remedial requirements can be adopted to prevent only deceptive practices defined in the body of the rule. To read the statute in that fashion would frequently propel the Commission into a more extensive regulation of trade practices than it thought necessary. For example, in this case the Commission has defined as a deceptive practice, in the Rule, the failure to disclose graduation and job-placement data but has placed in the SBP the various deceptive practices it discovered concerning false and misleading claims made about the schools themselves. If the Commission were required to place in the Rule all of these false and misleading claims and define them as deceptive practices, a wide variety of conduct could readily be found to violate the Rule, instead of being subjected to individualized adjudication under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 (1976). So long as deceptive practices are sufficiently defined, and documented with substantial evidence, I see no reason why the statute should be read to force their placement in the Rule, with consequent expanded regulation, instead of in the SBP.[5]

3. The Commission states that it has "predicated the requirements of Section 438.4 [the refund provision] on its ability to prevent and · remedy practices violative of Section 5 of the FTC Act pursuant to Section 18 of the FTC Act, which empowers the Commission to adopt trade regulation rules which include requirements designed to prevent occurrences of acts or practices that have been defined as unfair or deceptive under Section 5." SBP § C(6)(a), 43 Fed.Reg. at 60809.

4. In this respect the Commission's approach is somewhat anomalous. It has not designated the refund provision in the Rule as a requirement for preventing unfair or deceptive practices, as permitted by § 57a(a)(1)(B), preferring to define as an unfair or deceptive practice the failure to observe the refund requirement. But

then in its SBP the Commission discusses the refund provision as a remedy for other unfair or deceptive practices.

5. A possible objection to permitting remedies in the Rule to be linked to deceptive practices in the SBP is that § 57a(e)(5)(C) insulates the contents of an SBP from judicial review. But that insulation should not apply, and the Commission does not claim otherwise, to review the sufficiency of deceptive practices placed in the SBP rather than in the body of the Rule itself. Congress wanted courts to review the substance of any deceptive practice that was the predicate for a remedial requirement, regardless of where the deceptive practice was printed.

Thus, I am satisfied that the refund provision is procedurally valid either because the failure to provide refunds is itself properly defined as an unfair practice, or because the refund provision bears a sufficiently remedial relationship to the deceptive practices that are defined in the Rule or are adequately set forth in the SBP.

All of these considerations persuade me that the entire Vocational School Rule procedurally complies with § 57a(a)(1)(B). Of course, the Rule's procedural compliance is no assurance of substantive validity, i. e., that the Rule is supported by "substantial evidence in the rulemaking record . . . as a whole," as required by § 57a(e)(3)(A), and not otherwise unlawful. Of the several affirmative requirements in the Rule, the majority finds only two—the refund provision and the disclosure of job-placement statistics—to be substantively deficient. I now turn to these two requirements.

## 2. The Refund Provision

The pro rata refund provision, which the majority invalidates, serves primarily the same remedial purpose as the "cooling-off" and cancellation provision, which the majority upholds. The "cooling-off" remedy provides the student an opportunity to undo the financial commitment that has been made, at least in some instances, in reliance on a school's deceptive claims. Similarly, the refund provision permits the student to undo, at least on a pro rata basis, the financial commitment he was, in some instances, wrongfully induced to make.

The refund provision, like the "cooling-off" period, also serves an entirely legitimate preventive purpose of deterring the schools from using deceptive practices. It does so by lessening the incentive for vocational schools to add to their enrollment students who have been lured by deceptive claims. These students will find out that claims about the school are not true and will therefore claim their refunds. The schools are deterred from making such claims because they know that a pro rata refund will prevent them from making some of their anticipated profits. In some instances the deterrent effect is enhanced because some of the schools will not always be able to recoup a proportionate share of fixed costs. The "cooling-off" provision has the same effect, because a school obliged to make total refunds to students who cancel during the 14-day "cooling-off" period will forgo profits and sometimes lose money to the extent that the school has incurred additional expenses, such as extra teachers, in the expectation of increased enrollment. Realizing the risk of forgoing profits and even losing money if students either cancel and obtain total refunds during the "cooling-off" period or withdraw and obtain pro rata refunds thereafter, schools are thereby dissuaded from using deceptive practices to enroll students who will later learn the truth and rightfully demand return of all or a portion of their tuition.

Despite the obvious remedial and preventive purposes achieved by the refund provision, the majority invalidates it for what appear to be two possibly related reasons. First, the majority points out that the refund provision applies to all schools covered by the Rule, whether or not they have engaged in the specific deceptive practices that occasioned the need for the refund remedy. The refund provision is also available to all students, regardless of why they choose to withdraw. Of course, the same observations are true of the "cooling-off" period and cancellation remedies, which the majority upholds. But the more fundamental answer is that the requirements of substantive rules, like all exercises of power that is essentially legislative in nature, frequently cover more instances than those that prompted the requirement.

The objection of universality has a history as old as regulation itself. The complaint of universal application has usually been the last and least successful legal argument of a regulated industry. Cf. Buck v. Bell, 274 U.S. 200, 208, 47 S.Ct. 584, 585, 71 L.Ed. 1000 (1927), in which Justice Holmes described the converse objection of underinclusiveness as "the usual last resort of constitutional arguments." Rejecting an attack on a rule of the Interstate Commerce Commission obliging all carriers to observe

requirements with respect to assigning cars at coal mines, Justice Brandeis observed that "in establishing a rule of general application, it is not a condition of its validity that there be adduced evidence of its appropriateness in respect to every railroad to which it will be applicable. . . . [T]he Commission, like other legislators, may reason from the particular to the general." *The Assigned Car Cases,* 274 U.S. 564, 583, 47 S.Ct. 727, 734, 71 L.Ed. 1204 (1927). See also *United States v. Allegheny-Ludlum Steel Corp.,* 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972); *Pacific Coast European Conference v. Federal Maritime Commission,* 126 U.S.App.D.C. 230, 235, 376 F.2d 785, 790 (D.C.Cir. 1967) ("[T]he essence of rule-making is generality of application").

The complaint here is not simply that the Commission has reasoned from the particular to the general in concluding that a widespread condition exists. The more pointed objection seems to be that the Commission has imposed a remedial requirement upon a class not all of whose members have been shown to have acted improperly. When remedies are imposed upon a class that includes one or more identifiable subclasses to whom a remedy has not been shown to be appropriate, courts have not hesitated to intervene. *E. g., United States v. Nova Scotia Food Products Corp.,* 568 F.2d 240 (2d Cir. 1977) (application of fish-processing rule inadequately justified as to one species of fish). But the majority has cited no instance where a remedy applicable to all members of an appropriately defined class has been invalidated because a few members of the class have not taken the action that prompted the class-wide remedy. There is no need to speculate whether a case justifying court intervention in such circumstances might arise, because in one very important respect the refund remedy challenged in this case applies to every school covered by the Rule: the refund provision has been adopted by the Commission to deter all the schools from engaging in deceptive practices in the future. As the District of Columbia Circuit observed with respect to another agency, "[T]he Commission in rule-making is not confined to the

redress of demonstrated evils as distinct from the prevention of potential ones." *Pacific Coast European Conference v. Federal Maritime Commission, supra,* 126 U.S.App. D.C. at 235, 376 F.2d at 790.

Nor can the universality objection prevail because the refund provision applies not only to all of the schools covered by the Rule but also to all of the students, regardless of their reason for seeking refunds. Agencies exercising substantive rule-making authority to prevent improper conduct are not required to tailor their remedies so precisely as to insure that none but the wronged can ever benefit from them. All sorts of regulations improve the lot of many persons who did not specifically suffer because of the practices that occasioned the regulation. The Congress that enacted Magnuson-Moss was well aware, for example, of the Commission's rule on door-to-door sales, permitting consumers to cancel any contract within three days, regardless of whether the salesman had committed a deception and regardless of the consumer's reason for cancelling.

The basic point, however, is that the availability of the refund always serves the purpose of deterring deceptive practices, and its preventive effect is not lessened simply because it is sometimes claimed by students who have not been deceived into enrolling. Moreover, if circumstances should arise where the refund remedy is unnecessary for a particular school, the Act authorizes an application for exemption. 15 U.S.C. § 57a(g). The exempting power has long been recognized as an answer to complaints about the universal application of a regulation. *The Assigned Car Cases, supra,* 274 U.S. at 581, 47 S.Ct. 727; *The New England Divisions Case,* 261 U.S. 184, 199, 204, 43 S.Ct. 270, 67 L.Ed. 605 (1923); *National Nutritional Foods Ass'n v. Food and Drug Administration,* 504 F.2d 761, 784 (2d Cir. 1974), *cert. denied,* 420 U.S. 946, 95 S.Ct. 1326, 43 L.Ed.3d 424 (1975).

Of course, the Commission's authority to include in a rule a remedy for the purpose of deterring deceptive practices is not without limits. All power has its limits, and the

Commission's remedial power is no exception. The outer limits of that power are reached when its exercise ceases to have a remedial effect and instead operates solely or even primarily as a penalty. The Commission, in my view, is entitled to adopt refund requirements to deter deceptive practices so long as the refund requirement serves a bona fide remedial purpose, such as making the consumer whole or permitting the consumer to rescind a contract. The Commission could not require the schools to refund double a student's tuition. That technique would significantly deter the schools from enrolling deceived students who might later seek refunds, but such a provision would provide the students with a bonus, not a remedy. However, the pro rata refund is well within the bounds of a remedial power. From the student's standpoint, the refund is not a bonus; in fact, it will not even make him whole in those instances where the portion of the course he was misled into attending is worth less than the portion of the tuition that is not refunded.

When the majority invalidates the refund provision because it applies to every withdrawing student from every school "regardless of cause" (p. 664), it effectively removes this remedy from the rule-making process and relegates it to the more cumbersome and less effective adjudication process, where "cause" must be determined on a case-by-case basis. Congress enacted Magnuson-Moss to give the Commission the authority to combat deceptive practices with industry-wide requirements. The use of such power is hardly a sufficient reason for invalidating it.

Secondly, the majority invalidates the refund provision on the further substantive ground that even if the Commission has power to promulgate it, the record lacks substantial evidence from which a rational connection can be made between pro rata refunds and the prevention of deceptive enrollment practices. If the majority means only that there is no rational connection between the refund remedy and those schools that have not engaged in deceptive practices, the criticism would simply be another version of the primary attack on the industry-wide scope of the Rule. But the majority may mean either that the refund remedy is not rationally related even to those schools that have engaged in deceptive practices, or that the remedy is not rationally connected to the prevention of deceptive practices by all the schools. Since the Commission, having found deceptive practices prevalent in the industry, is entitled to adopt a remedy that will help to prevent deceptive practices by all schools covered by the Rule, the issue arises whether the refund remedy is rationally connected to this objective of prevention.

The statutory provision for holding unlawful any rule promulgated under Magnuson-Moss that is not supported by "substantial evidence," 15 U.S.C. § 57a(e)(3)(A), does not require, as the majority seems to imply, evidence of how a remedy will function in practice. If such evidence were required, no new remedy could ever be adopted. Indeed, it would be doubtful if old remedies shown to be successful in some fields could be adopted in other fields where they had never before been used. But the substantial evidence standard has never required a demonstration of the efficacy of a remedy. Determinations about the appropriateness of remedies are essentially legislative decisions, to be distinguished from adjudicatory decisions concerning the existence of wrongful conduct. The Supreme Court has recognized that rule-making procedures require agencies to make "factual determinations . . . of a judgmental or predictive nature . . . [for which] complete factual support in the record . . . is not possible or required . . . ." *Federal Communications Commission v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 813–14, 98 S.Ct. 2096, 2121–2122, 56 L.Ed.2d 697 (1978). See *Society of the Plastics Industry, Inc. v. Occupational Safety & Health Administration*, 509 F.2d 1301 (2d Cir.) cert. denied, 421 U.S. 992, 95 S.Ct. 1998, 44 L.Ed.2d 482 (1975); *Associated Industries of New York State, Inc. v. United States Department of Labor*, 487 F.2d 342 (2d Cir. 1973).

The Commission has fully articulated a "rational connection between the facts found and the choice made," *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962). The Commission has stated in the SBP that it adopted the refund remedy "to alter the incentive structure for obtaining vocational school enrollments." SBP § C(6)(a), 43 Fed.Reg. at 60809. The Commission seeks to impact the schools' incentive structure only to the limited extent that such an approach will deter the schools from engaging in deceptive practices. While the quoted fragment of language from the SBP could be interpreted to refer to changes in incentives with respect to enrollments generally, the context in which the language appears makes clear that the Commission asserts only the limited authority to alter incentives for enrolling deceived students. The SBP states:

> The pro rata refund provision of the rule adopted by the Commission is designed to alter the incentive structure for obtaining vocational school enrollments. No longer will schools be able to derive any significant financial benefit from engaging in unfair or deceptive enrollment practices. By equating the student's financial obligation with the length of his or her stay in the course, schools will be financially motivated to enroll only students with a genuine interest in the course. The use of deception to enroll students will no longer result in the creation of a large financial obligation to the school in the event of withdrawal.

*Ibid.*

This statement may stray a bit far in suggesting that schools will be discouraged from enrolling students without "a genuine interest in the course." Whether the student is serious or frivolous would seem to have little connection to whether he has been deceptively enrolled. But the overall thrust of the quoted paragraph makes plain that the primary focus is on deterring enrollment of the deceived student. Whether or not the refund provision will prove to be an effective way of deterring deceptive practices, it is clearly a rational way. I find

nothing in Magnuson-Moss to indicate that Congress, in authorizing the Commission to adopt requirements "for the purpose of preventing" deceptive practices, § 57a(a)(1)(B), prohibited the Commission from imposing requirements that not only provide a remedy for the students but also serve the purpose of reducing the incentive for the schools to lure the students in the first place. Altering the incentive of regulated entities to act in accordance with an agency objective was noted with approval by the Supreme Court in *United States v. Allegheny-Ludlum Steel Corp., supra*, 406 U.S. at 752, 92 S.Ct. 1941.

Not only has the Commission articulated a rational basis for the refund provision, it has also carefully weighed the objections to the remedy and concluded as a matter of policy that the benefits outweigh any disadvantages. SBP § C(6), 43 Fed.Reg. at 60809–10. I do not know if the Commission is correct in forecasting that the refund provision will reduce the incidence of deceptive practices. But I am satisfied that Congress gave the Commission ample authority to make that judgment, and the Commission has adequately supported the decision it has reached.

### 3. *Disclosure of Job-Placement Statistics*

The majority condemns only that part of the disclosure remedy concerning disclosure of job-placement statistics. This portion of the remedy is said to require misleading information and to be arbitrary and capricious. In my view, the job-placement disclosure requirement survives both of these alleged shortcomings.

The charge that the disclosure requirement itself mandates misleading information is plausible, but rests on a needlessly rigid interpretation of the Rule. The majority considers misleading the job-placement percentage required to be disclosed by any school that makes job-placement claims. The Rule requires that this percentage reflect, for any course, the ratio of graduates known to have found jobs within four months of graduation to the total number of graduates. 16 C.F.R. § 438.3(b),

(c). That known placement rate, as the petitioners contend, may be lower than the actual placement rate because the school may be unable to contact some graduates who did obtain jobs. Furthermore, the petitioners contend, the required placement rate is based on the total number of graduates rather than the total number of jobseekers, which may be considerably less.

I can readily agree that any remedy requiring the distribution of misleading information would be contrary to the Federal Trade Commission Act, but I find no such violation here. The Commission faced a difficult choice in selecting the ratio that fairly indicates a school's job-placement success. It considered alternatives and for sufficient reasons rejected them. SBP § C(4)(b), 43 Fed.Reg. at 60807. If it had succumbed to the industry's suggestion that the base include only graduates who had been contacted, the resulting placement rate would have been falsely inflated, since it can be presumed that employed graduates are more likely than unemployed graduates to respond to school inquiries. Exclusion from the base of those not seeking jobs also risked false inflation of the placement rate because some of those not available for employment may have become so by reason of their initial inability to find a job.

Faced with the reality that no single percentage could give a complete picture of the job-placement rate, the Commission opted for a percentage that reports one very significant and entirely truthful fact: the portion of the graduates *known* to have jobs within four months of graduation. I see no reason to prohibit the Commission from requiring the disclosure of that statistic. The most useful statistic, of course, would be the actual placement rate. But, unless the school has contacted and received responses

from all its graduates, the actual rate is not knowable. The unavailability of the actual placement rate should not preclude the Commission from requiring disclosure of the known placement rate.[6]

Ironically, the majority provides eloquent testimony on the need for the very remedy it has invalidated. The majority refers to one instance where the Commission's Rule requires a school to report, truthfully, that the known job-placement rate is 5.8%, whereas what the majority calls "the true employment success rate of those who responded" was 54%. There are two reasons why it is highly misleading to call this 54% a "true employment success rate." First, as the majority acknowledges, but as schools rarely do, this rate is based only on those who responded to the school's inquiry. The majority's example is a television servicing school that had 2,270 graduates, of whom only 929 responded to the job-placement inquiry. (McGraw-Hill Brief at 9–10). Neither the majority, the school, nor prospective students who may read the school's advertisement have any reason to think that the placement rate for the more than half of the graduates who did not respond is anywhere near as high as for those who did.

Secondly, as the majority fails to acknowledge, the 54% success percentage is not based on all the 929 graduates who responded, but only on the 244 of these (26%) who reported that they were seeking full- or part-time jobs. Again, neither the majority, nor the school, nor prospective students have any way of knowing how many of the 685 students not seeking jobs dropped out of the labor market because of the difficulty of finding a job or because the course left them woefully unprepared to handle one.

---

**6.** The Commission faced a somewhat similar problem in deciding whether and how to require disclosure of octane ratings. Industry sources contended that required disclosure of an octane rating would be misleading because the public would mistakenly tend to believe that this rating was the key indicator of gasoline quality to the exclusion of all other factors. The Commission reckoned with this objection, but decided nonetheless that the absence of octane ratings was deceptive. 36 Fed.Reg. 23877 (1971). Then, when the Commission decided to require disclosure of octane ratings, it faced industry contentions that no one of the three available rating systems was entirely accurate. In that situation, the Commission did not even select the one it thought was the best available; instead it invented a new rating system, based on an average of two of the existing systems. *Id.* at 23882–83.

The fact remains that the known placement rate of the school's graduates is 5.8%. It is also true that of the 929 who responded, 132 or 14% obtained jobs. It is also true that of the 244 respondents still seeking jobs, 132 or 54% obtained jobs.[7] But anyone who reads the majority's opinion and signs up for this course thinking he or she has a 54% chance of finding work will be sadly disappointed. I see no reason to fault the Commission for thinking that when the school reports the 54% figure and fails to report the two important qualifications that reduce that rate to a true known placement rate of 5.8%, it is misleading prospective students.

More troublesome is the Rule's apparent prohibition of the simultaneous disclosure of any other data, even data reasonably necessary to put the required job-placement statistic into perspective. The known placement rate is a truthful representation of fact, but it could be misleading if it were mistaken by a prospective student as a representation of the actual placement rate. The Commission recognized this risk and has permitted the schools to state in the required disclosure statement that not all of a school's students took a course to obtain jobs, that the school was unable to reach some graduates, to see if they got jobs, and that, as a result, the placement percentage might be understated. The majority criticizes this caveat as "anemic," a description not entirely undeserved if it is so, as the majority contends, that the school may not show how many students did not respond or were not seeking jobs.

The assumption that data on these items may not appear on the required disclosure statement draws support from the text of the Rule. The Rule not only specifies the percentage that must be disclosed, it also states that the "format" of the required notice must conform to examples set forth in appendices to the Rule, and it further provides that the required notice "shall contain no other information or representations." 16 C.F.R. § 438.3(e).

I would not construe these provisions of the Rule to prohibit the schools from including in the disclosure statement any truthful data reasonably necessary to make the required disclosure of the known job-placement percentage not misleading. The Rule properly sets forth the wording to be used for the required notices and specifies that no other information or representations may appear on the disclosure statement nor may any other materials be included in the envelope in which the required statement is mailed. These provisions insure that the information required to be furnished is made available in readable form, see SBP § C(9), 43 Fed.Reg. at 60812, and not hidden in a welter of other pamphlets. But those benign purposes should not be relied upon to give the Rule a rigid interpretation that would prohibit the inclusion of factually accurate data necessary to avoid a misleading impression that the disclosure statement might otherwise have.

For example, when the Rule says the schools may include the caveat that modifies the significance of the known placement rate, it should be interpreted to permit a school to state what percent of the graduates were not contacted or did not respond and what percent of the graduates did not take the course to get a job. The wording of the permitted caveat states that the school could not reach "some" of the graduates to see if they got jobs and that "not all" of the students took the course to get a job. If the school has truthful data, there is no reason to interpret the prohibition against disclosing "other information" so rigidly as to prevent the school from replacing the words "some" and "not all" with the actual numbers or percentages.

---

7. As the majority reports, a rate as high as 80% can be derived if the denominator includes only those who responded and only those seeking jobs and the numerator includes not only those who found employment but also those who became self-employed. In addition to the problems discussed in the text, the 80% figure, as well as all the other percentages, are flawed by the inclusion in the numerator of those employed only part-time. Surely it is misleading to claim that a graduate is "employed" if his TV servicing averages less than one hour a week.

That would leave the known job-placement ratio to be disclosed as the percentage the Rule requires, *i. e.*, with only graduates responding and known to have jobs in the numerator and all graduates, including those who enrolled without any intention of seeking jobs, in the denominator. But if the school has the data to put the required percentage in perspective, it should not be barred from doing so. There is no reason to interpret the prohibition on "other information" in a way that forces the required disclosure to be arguably misleading and therefore possibly unlawful. That prohibition can still serve to keep off the disclosure statement and out of the transmittal envelope all information on other topics, while permitting the vague words of the caveat to be quantified.

Thus construed, the required job-placement disclosure is neither misleading nor arbitrary and capricious.

### 4. *The Preemption Provision*

The majority also concludes that the preemption provision of the rule, 16 C.F.R. § 438.9, exceeds the power Congress granted to the Commission in · the Magnuson-Moss Act. The Commission contends that the validity of the preemption provision is not ripe for adjudication. This may be true for a challenge to the provision as applied. A challenge of that sort should await adjudication in the context of an alleged conflict with some specific state law or regulation. *Cf. Lee Optical, Inc. v. Board of Examiners in Optometry,* Civ. No. 77–0326–T (W.D. Okl. Feb. 5, 1979) (adjudicating and upholding the preemptive effect of the Commission's rule on ophthalmic goods, 16 C.F.R. part 456 (1979), upon a specific statute). But as the majority points out, a facial challenge to the provision is appropriate for adjudication now, because it does not involve consideration of any specific state statute.

Having reached the issue of facial validity, however, I would conclude that the Commission had validly exercised its power under the Magnuson-Moss Act. I agree with the majority that Congress did not intend the Commission's rules to have any greater preemptive effect than that which results from a ·conflict between these rules and state enactments. The Commission also agrees and has explicitly disclaimed any greater power. (Commission's Brief at 116). The language of the provision states that the Rule "preempts any provision of any state law, rule, or regulation which is inconsistent with or otherwise frustrates the purpose of the provisions of this trade regulation rule." This simply paraphrases the test for preemption that has been established by the Supreme Court. See *Colorado Anti-Discrimination Commission v. Continental Air Lines, Inc.,* 372 U.S. 714, 722, 83 S.Ct. 1022, 1026, 10 L.Ed.2d 84 (1963) ("To hold that a state statute identical in purpose with a federal statute is invalid under the Supremacy Clause, we must be able to conclude that the purpose of the federal statute would to some extent be frustrated by the state statute."); *Davis v. Elmira Savings Bank,* 161 U.S. 275, 283, 16 S.Ct. 502, 503, 40 L.Ed. 700 (1896) (state law violates Supremacy Clause when it "frustrates the purpose of the national legislation"); accord, *Nash v. Florida Industrial Commission,* 389 U.S. 235, 240, 88 S.Ct. 362, 19 L.Ed.2d 438 (1967) (quoting *Davis* ).

The majority seizes upon the word "purpose" in the preemption provision of the Rule to inflate the scope of the provision beyond what the Commission intends. In the majority's view, the provision would preempt any state law that conflicts not only with the Rule and its operation but also with the reasons for adopting the Rule. For example, the majority fears that the refund remedy would preempt not only conflicting state refund laws, but also any laws concerning the schools' incentive structure, which the refund provision was designed to affect. Since the Commission does not claim such a broad interpretation and the Supreme Court preemption cases do not authorize such a broad reading, there is no reason for the majority to read the rule so broadly and thereby find it invalid. The Rule is properly understood to mean that a state law would frustrate the purpose of the Rule if it provided for a lesser refund or

"cooling-off" period,[8] not if it attempted to regulate vocational school abuses in some unrelated way. As the Court has said, "The test of whether both federal and state regulations may operate, or the state regulation must give way, is whether both regulations can be enforced without impairing the federal superintendence of the field, not whether they are aimed at similar or different objectives." *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963). This was the test that was clearly intended by the Rule, and it does not exceed the Commission's power.

Contrary to the majority's suggestion, a preemption provision limited as this one is to displacement of conflicting state laws is not rendered unnecessary by the existence of the Supremacy Clause. To begin with, the provision makes clear that this preemptive effect is intended, rather than leaving the question of Commission intent open for subsequent litigation. More importantly, the preemption provision adopted by the Commission actually reduces the natural scope of preemption in certain circumstances, such as those where the Commission determines that the state regulation offers consumers more protection than the Rule does. Invalidating the entire provision risks increasing the impact of the federal rule on state legislation, since even state laws that are stronger than the federal requirements might be preempted under the Supremacy Clause in the absence of the Commission's modest provision.

### 5. *Conclusion*

Congress enacted the Magnuson-Moss Act to empower the Commission to take vigorous action on behalf of American consumers to protect them against deceptive trade practices. The Commission spent four years investigating and documenting exten-

sive deceptive practices in the field of proprietary vocational and home study schools. The petitioners' major assault on the Rule that resulted from that investigation is that it ushers in a new era of N.R.A.-type industry-wide codes. That fear is not groundless. Whether codes of the type exemplified by the Rule challenged in this case are a sound way to protect consumers from misleading trade practices and whether the resulting burden of regulation is worth the benefits are policy issues for the Congress. When Congress gives an agency substantive rule-making authority, it accords it a large measure of legislative power. It is the responsibility of Congress to determine how wisely that power is being used.[9] Our task is to determine only whether it is being used lawfully. In my judgment the Rule challenged in this case is entirely lawful.

---

8. A state law providing equivalent or greater protection to consumers either would be held not "inconsistent" with the Commission's Rule or would be a likely candidate for exemption by the Commission.

9. At least one body of Congress is ready to assert significant legislative oversight over the

Commission's rule-making authority. On November 27, 1979, the House of Representatives passed H.R. 2313, 96th Cong., 1st Sess. (1979), subjecting all trade regulation rules to legislative veto. 125 Cong.Rec. H11,205–06 (daily ed. Nov. 27, 1979).